### TRIPP v. BAGLEY et al.

No. 4681.   Decided December 11, 1928.   (276 P. 912.)
Rehearing Denied April 13, 1929.

58

*William B. Higgins,* of Fillmore, for appellant.

*Barnard J. Stewart* and *King & King,* all of Salt Lake City, for respondents.

HANSEN, J.

Plaintiff brought this suit against defendants to quiet title to several tracts of land situated in Secs. 1 and 11, Tp. 11 S., R. 17 W., S. L. M. The land is at Callao, Juab county, Utah. The defendants answered and filed a cross-complaint against the plaintiff. In the cross-complaint defendants claim title to about 6.44 acres of the land claimed by plaintiff. The plaintiff's claim to the 6.44 acres of land in dispute is founded upon his record title thereto. The defendants base their claim to the 6.44 acres of land in dispute upon their alleged possession thereof under claim of right for more than 40 years.

The plaintiff and defendants own coterminous tracts of land. The disputed tract of land is on defendants' side of what defendants claim is a fixed boundary line between their land and the land owned by the plaintiff. Defendants also claim a right to course irrigation water which is used to irrigate their land across the land owned by the plaintiff. The plaintiff contends that they have no such right.

These proceedings were begun in Juab county, but upon stipulation of counsel were transferred to Salt Lake County for trial. Trial was had before the court without a jury. The court awarded the 6.44 acres of land in dispute to the defendants. The court also found that defendants were entitled to course their irrigation water through two artificial ditches across plaintiff's land. The plaintiff appeals.

The defendants assign cross-errors and claim that the court should have found that one of the irrigation ditches through which they were awarded the right to course their water was a natural channel, and should have been so found.

By the assignments of error the plaintiff attacks the sufficiency of the evidence to support the findings and the decree awarding the 6.44 acres of land to the defendants.

The plaintiff deraigns his title to the land in dispute through his father, E. W. Tripp. On July 2, 1883, E. W. Tripp made a homestead entry, which included lot 4 and the southwest quarter of the northwest quarter of Sec. 1, Tp. 11 S., R. 17 W., S. L. M. Final certificate for his homestead entry was issued to E. W. Tripp on January 3, 1884, and patent issued August 3, 1899. E. W. Tripp conveyed the property included within his homestead entry to his wife, Julia A. Tripp, by warranty deed dated September 28, 1888. Julia A. Tripp conveyed the property in dispute to the plaintiff by deed dated August 28, 1919.

The defendants deraign title to their lands in manner following: On July 3, 1883, George W. Boyd made a homestead entry which included lot 3 and the southeast quarter of the northwest quarter of Sec. 1, Tp. 11 S., R. 17 W., S. L. M. On November 28, 1887, George W. Boyd received final certificate for his homestead entry. Patent was issued to him under date of March 4, 1890. George W. Boyd and his wife, Abgail S. Boyd, conveyed the land covered by his homestead entry to Charles Bagley, the father of the de-

fendants E. C. Bagley, A. H. Bagley, and F. E. Bagley, by warranty deed dated April 16, 1888. Under date of January 6, 1908, Charles Bagley and his wife conveyed the land received from George W. Boyd to his sons Edward C. Bagley, Andrew H. Bagley, Frank C. Bagley, defendants herein, and Grant C. Bagley. On April 4, 1925, the Bagley land was conveyed to Juab county, Utah, by auditor's tax deed. On May 7, 1927, the Bagleys paid the taxes, and Juab county conveyed the land to the defendant Frank E. Bagley.

The subjoined plat will serve to illustrate and enable the reader to better vizualize the shape and location of the land in dispute.

The line A-B represents the location of the surveyed boundary line between lot 3 and lot 4 and between the southwest quarter of the northwest quarter and the southeast quarter of the northwest quarter of Sec. 1, Tp. 11 S., R. 17 W., S. L. M.

The plaintiff thus holds the record title to the land lying to the reader's left of the line A-B. The defendants own

the land lying to the reader's right of the line A-B. The tract of land in dispute is indicated by the enclosure A-E-D-C. The courses and distances of the boundary of the land in controversy are shown on the plat.

In about 1870 E. W. Tripp and his wife, Julia A. Tripp, established their home at Callao near the land here in dispute. Soon after the Tripps located at Callao they inclosed within a fence about 18 or 20 acres of the best land located in the immediate vicinity. The land within the inclosure was used to raise cultivated crops. The land in dispute was included within the inclosure. The westerly part of the fence was constructed along or near the line C-D-E indicated on the foregoing plat. At the time the fence was so constructed the land in and about Callao had not been surveyed. In about the year 1877 George W. Boyd and his family located at Callao. After Boyd established his home at Callao, his family and the Tripps jointly used the land or a part of the land in controversy for the purpose of raising gardens. In the spring and summer of 1882 the land at Callao, including the land here in controversy, was surveyed under the direction of the U. S. Surveyor General's office of Salt Lake City, Utah. At that time the line A-B on the foregoing plat was run between lot 3 and lot 4. Soon after this survey was completed a fence was erected along the line between the southwest quarter of the northwest quarter and the southeast quarter of the northwest quarter of Sec. 1, Tp. 11 S., R. 17 W., S. L. M., extending south from the point indicated by E on the plat. The location of the fence along the line C-D-E was not changed. The Boyds and Tripps continued to use jointly the land in dispute up to and including the year 1885. In April, 1885, Charles Bagley took up negotiations with George W. Boyd for the purchase of the land included within Boyd's homestead entry.

The defendant A. H. Bagley testified that in April, 1885, he and his father, Charles Bagley, went out to Callao to

purchase the Boyd ranch; that they, together with George W. Boyd and E. W. Tripp, went to look over the gardens which were then growing upon the land in dispute; that Mr. Boyd "said that that was the first piece of ground ever broken up in that country. * * * That when Mr. Tripp made his entry his land took in this piece of ground, but it was his property and always had been, and Mr. Tripp said he always considered it as part of Mr. Boyd's ranch. Father (Charles Bagley) said 'unless that piece goes on the ranch that I am buying so that my boys can raise some potatoes and garden stuff I wouldn't have the ranch, * * * I would want all this enclosed with a fence in this piece, I would want to consider that I was buying that' and Mr. Tripp and Mr. Boyd said that would be the boundary line. It was a good pole fence on the south and there was a fence on the west with several wires with poles laid on the top and they said that must be the boundary line between the ranches and they stated it would be so." On May 6, 1886, Charles Bagley paid George W. Boyd $1,000 on the purchase price of the Boyd ranch. The Bagleys went into possession of the Boyd ranch in the spring of 1886, and they retained possession thereof until this action was begun in August, 1922. Charles Bagley, G. W. Boyd, and E. W. Tripp were all dead when this suit was tried. The plaintiff, George W. Tripp, testified that in 1889 he overheard a conversation between his father, E. W. Tripp, and defendant E. C. Bagley in the presence of B. B. Tripp, wherein E. W. Tripp told defendant E. C. Bagley that, if he (Bagley) was going to reconstruct the fence along the line C-D-E, he (Bagley) should move it back onto the line between lot 3 and lot 4; that, at the time this conversation was had, defendant E. C. Bagley moved part of the fence farther to the west. The plaintiff also testified that about that time his father, E. W. Tripp, placed four posts along the line of the survey between lot 3 and lot 4. B. B. Tripp corroborated the testimony of the plaintiff as to the conversation between E. W. Tripp and defendant E. C. Bagley. James

Spence testified that he, was at Callao from November 1919, until December, 1920; that he had a conversation with E. C. Bagley concerning the boundary line between the Bagley ranch and the Tripp ranch; that Bagley stated that the survey line between the Tripp ranch and the Boyd ranch was not legal, because it was not made by the county surveyor; that one day while he was at the Bagley house a nephew of E. C. Bagley came in with a post attached to a lariat, and said, "Here is one of the posts that Tripp put up on the corner up there." Spence further testified that he saw posts along the line between lot 3 and 4, and also saw where a post located on the boundary line had been cut off; that E. C. Bagley said he cut the post down; that, while Spence was moving on the land in dispute, Bagley told him to cut down a post that was in the way; that he saw one of the posts that was located on the boundary line between lot 3 and lot 4 after the same had been dug out of the ground. E. C. Bagley denied that E. W. Tripp told him to put the fence on the survey line, and also denied generally the testimony of the witness Spence. The defendant E. C. Bagley further testified that E. W. Tripp assisted him in repairing the fence along the west side of the land here in controversy. From the time Charles Bagley purchased the Boyd homestead in 1886 until 1907 the defendant E. C. Bagley was in personal control of the Bagley ranch. From 1907 to 1917 the Bagleys leased their land. During four of those years the Bagley land was leased to E. W. Tripp, the father of plaintiff, and for two years the Bagley land was leased to George W. Morehouse, a son-in-law of E. W. Tripp. No claim is made that the Bagleys ever paid any taxes upon the land in dispute, or that they placed any improvements thereon, except to repair the fence along the west side thereof.

It is upon substantially the foregoing evidence that the defendants and cross-complainants claim that they are entitled to the land in dispute, and the plaintiff contends that he is entitled to have his title thereto quieted.

It is clear that defendants have failed to establish title to the land in controversy by adverse possession, because neither they nor their predecessors in title ever paid any taxes thereon.

Laws Utah 1884, p. 186, § 185, provided:

"For the purpose of constituting an adverse possession by a person claiming title not founded upon a written instrument, judgment or decree, land is deemed to have been possessed and occupied in the following cases only: (1) Where it has been protected by a substantial enclosure; (2) where it has been usually cultivated or improved; (3) where labor or money has been expended upon dams, canals, embankments, aqueducts or otherwise, for the purpose of irrigating said lands, amounting to the sum of five dollars per acre, *provided, however,* that in no case shall adverse possession be considered established under the provisions of any section or sections of this Code unless it shall be shown that the land has been occupied and claimed for the period of seven years continuously, and the party or persons, their predecessors and grantors have paid all the taxes, Territorial, county or municipal, which have been levied and assessed upon such land according to law."

The laws of the territory and state of Utah have remained substantially the same as that above quoted up to the present time. Comp. Laws Utah 1917, §§ 6455, 6456. It is equally obvious that plaintiff is not estopped from claiming the land in controversy because of any improvements placed upon the land by the defendants or their predecessors in title. It is therefore clear that defendants' claim to the land in controversy must stand or fall either upon an express agreement fixing the boundary line, or upon acquiescence in a boundary line between the land owned by plaintiff and that owned by defendants.

So far as length of time is concerned, the fence claimed by defendants as marking the boundary line has been established for a sufficiently long period to support defendants' claim. It was erected in about the year 1870, and, according to the testimony of defendants, it has remained in the same location until this suit was begun in 1922. Ac-

cording to the rule laid down by the text-writers and practically all of the adjudicated cases where the question is discussed, one of the requisites necessary to the establishment of a boundary line other than the true boundary line between adjoining landowners by oral agreement or acquiescence, in the absence of adverse possession or estoppel, is that the location of the true boundary sought to be thus established is or has been uncertain or in dispute. In 1 Tiffany, Real Property (2d Ed.) § 294, the law is thus stated:

"An agreement between adjoining owners as to the location of a boundary line, though merely oral, is not, it is generally conceded, invalid as being within the Statute of Frauds, provided the agreement is followed by actual or constructive possession by each of the owners up to the line so agreed upon, and provided further, that the proper location of the line is uncertain or in dispute; the theory being that the agreement does not, in such case, involve any tranfer of title to land, but merely an application of the language of the instruments under which the owners claim. On the other hand, it has been held that, if the boundary line is not doubful or in dispute, an oral agreement for its change is invalid, this involving an actual transfer of land, within the statute."

In 9 C. J. § 177, p. 233, the law is thus stated:

"In order to establish the validity of a parol agreement establishing a boundary it is necessary that there shall be doubt and uncertainty as to its true location. The reason is that, where there is no uncertainty as to the boundary lines, a parol agreement fixing boundary lines in disregard of those fixed by the deeds is void under the statute of frauds, as it amounts to a conveyance of land by parol."

To the same effect is 1 Thompson on Real Property, §§ 3103, 3104, pp. 194, 195.

An examination of the numerous cases cited in the footnotes to the above texts convinces us that the texts are supported by the great weight of judicial authority.

Counsel for defendants cite and rely upon the rule announced by this court in the following cases: *Holmes* v.

*Judge,* 31 Utah 269, 87 P. 1009; *Moyer* v. *Langton,*
37 Utah 9, 106 P. 509; *Rydalch* v. *Anderson,* 37 Utah
99, 107 P. 25; *Young* v. *Hyland,* 37 Utah 229, 108 P.
1124; *Farr* v. *Thomas,* 41 Utah 1, 122 P. 906; *Binford* v.
*Eccles,* 41 Utah 457, 126 P. 333; *Christensen* v. *Beutler,* 42
Utah 392, 131 P. 666; *Tanner* v. *Stratton,* 44 Utah 253, 139
P. 940; *Warren* v. *Mazzauchi,* 45 Utah 612, 148 P. 360; *Van
Cott* v. *Casper,* 53 Utah 161, 176 P. 849. In these cases the
rule is announced and reiterated that, where the owners of
adjoining lands occupy their respective premises up to a
certain line which they mutually recognize as the boundary
line for a long period of time, they and their grantees may
not deny that the boundary line thus recognized is the true
one. The general rule thus repeatedly enunciated has be-
come the settled law in this jurisdiction. However, the
question for determination in this case is whether the facts
here bring it within the general rule or constitute an ex-
ception thereto.

Counsel for both the appellant and the respondents claim
that the rules of law announced in *Rydalch* v. *Anderson,*
supra, support their respective claims in this case. The
learned trial judge, with some reluctance and misgiving, as
indicated by his written memorandum of decision filed here-
in, came to the conclusion that the case of *Rydalch* v. *Ander-
son* was controlling in the instant case, and necessitated a
decree quieting title in the defendants to the land here in
dispute. The facts in the *Rydalch* v. *Anderson* Case are in
many respects similar to the facts in this case. In the
*Rydalch* v. *Anderson* Case, however, when the boundary
line was fixed between the Rydalch land and the Anderson
land, the true boundary line was not known. In this case
it is clear that when Charles Bagley was negotiating for
the purchase of the Boyd property both Charles Bagley and
his son, the defendant A. H. Bagley, were informed that the
fence here claimed by the defendants as the boundary line
was not in fact on the true boundary line.

Counsel have regarded this proceeding as a suit in equity,

and we so consider it. In such case it becomes our duty to review questions of both the law and the facts. Practically all of the direct evidence is to the effect that neither G. W. Boyd nor E. W. Tripp regarded the fence along the line C-D-E as marking the boundary line between their respective homesteads. It was not erected for any such purpose. The courses and distances of the fence are such that no one at all familiar with government surveys could possibly have been misled into the belief that the line was, or would become, the line of a legal subdivision of a government survey. Boyd and Tripp jointly used the land in dispute until the Bagleys purchased the Boyd ranch. The evidence affirmatively shows that E. W. Tripp and George W. Boyd did not agree upon or fix any boundary line between their homestead claims before the same was surveyed in 1882. They could not well fix any boundary line that would be binding upon themselves or others until they acquired some interest in the land itself. They did not file upon the lands included in their respective homestead entries until a year after the same had been officially surveyed. After the survey was made, the evidence is all to the effect that E. W. Tripp, G. W. Boyd, Charles Bagley, and the defendant A. H. Bagley knew where the true boundary line was located. The defendant F. E. Bagley testified that when he first saw the fence line between the Tripp and the Bagley ranches his attention was called to the "jog in the fence line because any man knows out in the prairie country, out like that, the fence lines are either on an angle or straight and there are no jogs." It thus appears that the parties to this suit knew that the fence line C-D-E did not and could not be along the true boundary line between the property owned by the plaintiff and that owned by the defendants. It thus becomes of controlling importance to determine whether two adjacent landowners may establish a boundary line between their lands by oral agreement or by acquiescence for a long period of time, when there is no uncertainty as to the location of the true boundary line,

and where it is known by them at all times that the boundary line sought to be established is not the true boundary line.

It should be kept in mind that we are not here dealing with a case of adverse possession of land, as that term is defined by the laws of this state. Neither are we dealing with a case where any permanent improvements have been placed upon the land in reliance upon an established boundary line. As already indicated, these elements do not enter into the instant case. We have already stated the general rule of law enunciated by the great weight of authority. In the case of *Rydalch* v. *Anderson*, supra, the court said:

"It is true that where the true line is known parties may not by parol agree upon some other point as the boundary line, and in that way pass title to land by parol. This, however, is not that kind of a case."

In the case of *Binford* v. *Eccles*, supra, this court said:

"Appellant's counsel do not dispute any of the foregoing facts, but they contend that when respondent purchased she purchased a parcel twenty-six and one-half feet commencing at a designated point; that by measuring from said point said twenty-six and one-half feet did not extend the east line of her parcel of land to the fence aforesaid, but left a distance between said fence and said east line of about twenty inches or two feet; that the east boundary line where said twenty-six and one-half feet terminated was always known or easily ascertained, hence there never was any uncertainty with regard to where the east boundary line of respondent's parcel was, and, this being so, the fence was not intended as, nor does it constitute, a practical location of a disputed or an unknown boundary line, and therefore the principle of law which controlled the cases of *Holmes* v. *Judge*, 31 Utah 269, 87 P. 1009; *Rydalch* v. *Anderson*, 37 Utah 99, 107 P. 25, and *Young* v. *Hyland*, 37 Utah 229, 108 P. 1124, does not apply to this case. We cannot agree with this contention. There was a question in this case with respect to the quantity of surplus ground, and respondent's east boundary line was therefore extended beyond the limits of the twenty-six and one-half feet to the fence."

It will thus be observed that this court has recognized the rule that, where coterminous landowners know the

location of the true boundary line, they may not establish a valid boundary line between their lands by a mere parol agreement at a place other than the true line. It may also be said that general language has been used in the decisions of this and other courts wherein the question of boundary lines has been under consideration, which indicates that a boundary line may become fixed between coterminous landowners merely by long acquiescence without regard to any uncertainty in the location of the true boundary line. However, the exact legal question here presented for determination has not heretofore been decided in this jurisdiction. The statute of frauds provides that a conveyance of real estate must be in writing. Comp. Laws Utah 1917, § 4874, p. 994, and section 5811, p. 1132. The mere fact that the person claiming title by parol agreement owns land adjacent to the land thus sought to be conveyed cannot and does not change the law. The statute of frauds applies to adjacent landowners, as well as to persons who are not so situated. The Supreme Court of California, *Lewis* v. *Ogram*, 149 Cal. 505, 87 P. 60, 10 L. R. A. (N. S.) 610, 117 Am. St. Rep. 151, has the following to say about the establishment of a boundary line by agreement:

"If adjoining owners agree on a division line, knowing that it is not the true line, and with the purpose of thereby transferring from one of them to the other a body of land which they know his true line does not embrace, the agreement will not be enforced. Such a transaction would not constitute an adjustment of uncertainties or doubts as to the line, but would be an attempt to convey or release land from one to the other. Land cannot be conveyed by the device of moving fences or changing the marks or monuments which define its limits. If an agreement having for its real object the transfer of the land, but relating by its terms solely to the boundary line and made with knowledge that the true line is elsewhere than at the place fixed, is oral, it would be void, being an attempt to transfer land without writing. If it is in writing it would be ineffectual to pass title, for it would lack the apt words of conveyance that are necessary to accomplish a transfer of real property."

We further remark that, if adjoining landowners acquiesce in a division line other than the true line, with knowledge of the location of the true line and with the design and purpose of thereby transferring a tract of land from one to the other, such acquiescence alone will not operate as a conveyance. Land cannot be conveyed from one person to another by merely a change in possession, even though such change in possession continues for a long period of time. The statute defining what shall constitute adverse possession is of the same degree of efficacy as is the statute of frauds. In order that possession may ripen into title, it is necessary that the person claiming title must pay the taxes levied against the land claimed as provided by law. An oral agreement, however, fixing a dividing line between adjoining landowners is not within the statute of frauds when the true line is uncertain or in dispute, because such agreement is not regarded as passing title to land but

"determines the location of the existing estate of each, and, when followed by possession and occupancy, binds them, not by way of passing title, but as determining the true location of the boundary line between their lands." *Berghoefer* v. *Frazier*, 150 Ill. 577, 37 N. E. 914.

If the defendants rely upon the doctrine of equitable estoppel as a basis for their claim to the land in dispute, the fact, that at no time was there any uncertainty as to the location of the true boundary line, defeats such claim. One of the essential elements which must enter into and form a part of an equitable estoppel is that the truth concerning the facts relied upon by the person claiming the benefit of the estoppel was unknown. A person may not avail himself of the conduct, acts, language, or silence of another under the doctrine of equitable estoppel, unless such person has been misled thereby. 2 Pomeroy, Eq. Jur. (4th Ed.) § 805. While there is evidence in this case to the effect that about a year before Charles Bagley purchased the Boyd ranch E. W. Tripp, the

predecessor in title of plaintiff, stated that the land in controversy had been, and would continue to be, part of the Boyd ranch, yet at the same time Charles Bagley was informed that the land was not within the Boyd homestead entry. One of the defendants was present at this conversation, and it is quite obvious that no one could well be misled into believing that the fence along the line C-D-E on the foregoing plat was located on the true boundary line. The defendants and their predecessors in interest and title have received the rents and profits from the land; they have made no improvements thereon while plaintiff and his predecessors in title have paid the taxes thereon. In such case the defendants are not in a position to invoke the doctrine of equitable estoppel against plaintiff in support of their claim to the land in dispute. We are therefore of the opinion, and so hold, that the defendants have failed to establish either a legal or an equitable claim to the land in dispute.

The plaintiff also urges that the evidence does not support the findings and decree awarding defendants the right to use and maintain any irrigation ditches across his land. There is a sharp conflict in the evidence upon the issue raised by the pleadings as to the location of the natural channel, the right to the use of which is claimed by the defendants across plaintiff's land. There seems to be no dispute, however, about the fact that a natural channel extended across plaintiff's land. It also appears that irrigation water was used to irrigate the land owned by defendants before such land was purchased by Charles Bagley in 1886. It is plaintiff's contention that the ditches through which the irrigation water has been conveyed to defendants' land have been changed from year to year, and that from 1907 to 1917 no irrigation water was used upon defendants' land. The evidence tending to show that the defendants used any irrigation ditches during the time that the Bagley land was leased, that is from 1907 to 1917, is somewhat meager, but, for the reasons presently

to be considered, we are of the opinion that the right of the defendants to convey their water across plaintiff's land is not dependent upon the law applicable to the acquirement of an easement by prescription. It may be conceded that plaintiff is supported by the authorities in his contention that an easement by prescription cannot be acquired over land belonging to the state or the United States, 19 C. J. §§ 23, 24, p. 876, and cases cited in the footnote. Such has been declared to be the law in this jurisdiction as applied to land belonging to the United States. *Bolton* v. *Murphy*, 41 Utah 591, 127 P. 335; *Lund* v. *Wilcox*, 34 Utah 205, 97 P. 33. The title to a part of plaintiff's land over which the defendants claim the right to convey the water with which to irrigate their land was conveyed by the United States to E. W. Tripp, the predecessor of the plaintiff, in 1899. Part of the land was conveyed by the United States to the plaintiff in 1899. The title to the other land over which the defendants claim such right was conveyed by the state of Utah to the plaintiff in 1913. It will thus be seen that, if there was a break in defendants' use of the irrigation ditches across plaintiff's land from 1907 to 1917, the defendants could not acquire an easement by prescription across plaintiff's land, because there could not be a continuous use for a period of 20 years. As to the land conveyed to plaintiff by the state of Utah in 1913, obviously a prescriptive easement could not be acquired up to 1922 when this suit was begun. If the defendants had based their claim to the right to convey water across plaintiff's land solely upon the theory of an easement by prescription they have failed to establish such right particularly as to the land which plaintiff purchased from the state of Utah in 1913. The defendants, however, allege, and the evidence shows, that a natural water channel ran across the lands owned by the plaintiff onto the land owned by the defendants. During high water sand and gravel has been carried down this natural channel onto plaintiff's land where the gradient becomes less, with the result that the natural

channel has at times been filled up, thereby causing the water to change its course by cutting new channels or spreading out over the surrounding territory. In the past, when necessary, the Bagleys have gone onto plaintiff's land and either cleaned out the old channel or constructed new channels, so that the irrigation water to which the defendants were entitled would flow onto their lands. While the law is well settled that an easement by prescription cannot be acquired in less than 20 years' continuous use, such is not the law when applied to the right to convey water through a natural channel across the lands of another. In 2 Kinney on Irrigation (2d Ed.) § 991, p. 1751, the law applicable to the right of an appropriator of water to have his water flow through a natural channel over lands in private ownership is stated in the following language:

"An appropriator of the waters of a natural stream flowing through the public domain acquires an easement over the lands through which the stream flows for the flow of the water to his point of diversion, as it was wont to flow when he first made the appropriation. This right is also acquired as against the subsequent purchasers of the lands from the United States and their grantees. It therefore follows that an appropriator has the implied authority to do all that is necessary to secure the enjoyment of such easement. He therefore has the right to go upon the lands after they have become private and remove obstructions from the bed of the stream, so as to permit the water to continue its flow in its original channel to the head of his ditch."

The law is also well settled that, when an easement has once been established, its location may be changed by an executed oral agreement between the owner of the servient estate and the owner of the dominant estate. *Thompson et al.* v. *Madsen et al.*, 29 Utah 326, 81 P. 160. The consent of the owner of the servient estate to a change in the location of an easement may be implied from acquiescence. *Rumill* v. *Robbins*, 77 Me. 193; *Larned* v. *Larned*, 1 Metc. (Mass.) 421; *Wynkoop* v. *Burger*, 12 Johns, (N. Y.) 222. When the location of an easement has been changed by an agreement, either express or implied, be-

tween the owner of the dominant estate and the owner of the servient estate, such location cannot be again changed without the mutual consent of such owners, note to *Dudgeon* v. *Bronson,* 95 Am. St. Rep. pages 323, 324. To the same effect, see, also, Thompson on Real Property, vol. 1, § 516; 19 C. J. § 251, p. 973. *Thompson et al.* v. *Madsen et al.,* supra. It should be further observed that the plaintiff is not here contending that the defendants should be confined to the use of the original natural channel as a means of conveying their irrigation water to their lands, but plaintiff contends that defendants have no right whatsoever to convey irrigation water across his land. We are of the opinion that the plaintiff must fail in such contention. When a person has a right to convey water through a natural channel across lands of another, such right is not lost when the owner of the right constructs, without objection, an artificial ditch or ditches across such land and uses the same for a number of years to convey the irrigation water theretofore conveyed through the natural channel. In such case the owner of the easement has the right to continue to use the artificial ditch or ditches so constructed and used in lieu of the original natural water course.

It is further urged on behalf of the plaintiff that there is a material variance between the allegations of defendants' cross-complaint and the facts found by the trial court. In their cross-complaint, defendants alleged, in substance, that for more than 40 years they and their predecessors in title and interest used the natural channel across plaintiff's land to convey irrigation water to irrigate their land. Defendants also allege that more than 30 years ago the defendants and their predecessors in title constructed two irrigation ditches across plaintiff's land, and that ever since the same were constructed they and their predecessors in interest have openly, notoriously, continuously, and adversely and under claim of right, used said ditches for the purpose of conveying water to their land. The courses and distances of the alleged natural channel and the two artificial ditches

claimed by the defendants are described in defendants' cross-complaint. The trial court found that what the defendants claimed to be a natural channel was an artificial irrigation ditch. The trial court further found that:

"There are three natural streams of water, known as Basin Creek, Tom's creek and Indian Farm Creek, arising in the mountains west and southerly of the lands owned by the plaintiff and the lands owned by the said defendants, the waters of which said streams are diverted and used upon the lands of the plaintiff and the lands of said defendants, and others owning waters in said streams. The said defendants and their predecessors in interest have, for more than forty years last past, diverted from the natural channel of said streams and upon the lands of the said defendants, one third of the waters of said streams; one third of the waters of said streams being diverted by the Kearney interests; and one third of the waters of said streams being diverted by the Tripp interests, which said three interests take all of the comingled waters of said streams. The court finds that said defendants and their predecessors in interest have, for more than forty years last past, openly, notoriously, continuously, uninterruptedly, adversely and under claim of right, as against the plaintiff and his predecessors in interest, and all the world, and with the knowledge and acquiescence of the plaintiff and his predecessors in interest, used what is known as the 'West Ditch,' and what the court herein designates as 'Center Ditch' (which ditches cross the lands of the plaintiff) in which to convey water to their said lands, and the defendants and their predecessors in interest have gone upon the lands of the plaintiff to repair and maintain said ditches, and the said defendants are now the owners of the right to use said West Ditch and said Center Ditch over plaintiff's land, in which to convey to the said defendants' land the waters of said streams so owned and used by the said defendants, together with the right to go upon the lands of the plaintiff, where said ditches pass over and through plaintiff's land, for the purpose of cleaning, repairing, putting in the necessary gates and culverts, and doing such other things as are necessary and incident to the maintenance, upkeep and use of said ditches, together with the right to use one rod of ground on each side of the center line of said ditches, or so much thereof as is necessary, in the cleaning, maintaining and repairing of said ditches, by the use of plow, scraper, team and/or other proper means, with the right to place on either side of said ditches sand, gravel and other materials removed therefrom or used in connection therewith, defendants to construct over said streams suitable bridges or crossings where necessary for the use of the plaintiff.

"The course of said Center Ditch is particularly described as follows:

" 'Beginning at a triple dividing headgate, from which the section corner of Sections 1, 2, 11, and 12, Township 11 South, Range 17 West, Salt Lake Meridian, bears North 38° 40' East 2210 feet distant, and thence following a natural channel North 32° 30' East 1230 feet; thence North 21° 30' East 1540 feet; thence North 57° 20' East 1070 feet; thence North 18° 45' East 485 feet, to a point designated as Point B, where a diversion ditch branches; thence North 61° 00' East 575 feet; thence North 43° 20' East 610 feet; thence North 160 feet to the South fence line of the old Lincoln Highway, and crossing said highway on to the lands of the said defendants.'

"Said Center Ditch is approximately five feet wide at the bottom and eight feet wide at the top.

"The course of said West Ditch is particularly described as follows, to wit:

" 'Beginning at a point designated as Point B, aforementioned; thence North 12° 45' East 1300 feet; thence East 150 feet to the West fence line of the old Lincoln Highway and crossing said highway on to the lands of the said defendants.'

"Said West Ditch is approximately five feet wide at the bottom and eight feet wide at the top.

"The court finds that what is described in the pleadings as the East Ditch has been abandoned by the said defendants."

The course of what the trial court designated as the "Center ditch" is the same as the course of what defendants alleged was a natural channel. The course of the West ditch is also the same as that alleged in defendants' cross-complaint. Thus, in their cross-complaint, the defendants base their claim to the right to use the Center ditch upon an allegation that it is a natural channel. They base their claim to the right to use the West ditch upon an alleged prescriptive easement. A careful examination of the record convinces us that the great preponderance of the evidence shows that a natural water channel extended across plaintiff's land to the lands of the defendants; that as early as 1883 the predecessor in title of the defendants diverted water from this natural channel with which to irrigate the land now owned by the defendants; that the natural channel from time to time became filled up with silt brought down

by high water; that when the natural water channel was thus filled up defendants either cleaned out the old channel or cut new channels across plaintiff's land so that the water to which they were entitled could course on to their land; that neither the ditch designated as the "West ditch" nor the Center ditch followed·the course of the original natural channel was abandoned; that the plaintiff and his prede- by the defendants and their predecessors in title many years before this action was begun and the original natural channel; was abandoned; that the plaintiff and his prede- cessor in title asquiesced in, and thereby consented to, the arrangement whereby the old natural channel was aban- doned and the West ditch and the Center ditch were used as a means of conveying defendants' irrigation water to their lands in lieu of the old natural channel.

The findings of fact should be so amended as to conform to the foregoing views. As thus amended, the conclusions of law and the decree made and entered by the trial court as to defendants' right to the use of the West ditch and the Center ditch should be affirmed.

The ultimate fact tried out in this proceeding was whether or not the defendants had any easement or easements across plaintiff's land for conveying water to the lands owned by the defendants. The mere fact that the defendants failed to establish the exact origin of such easements as were alleged by them cannot well be said to defeat their claim. It has been held "that an allegation that the plaintiff is the owner of a described right of way or other easement over defendant's land and that such easement is appurtenant to plaintiff's land is an averment of fact or ultimate fact and not a conclusion of law and is a sufficient statement of the title to be established." 9 R. C. L. § 74, p. 818; *Corea* v. *Higuera,* 153 Cal. 451, 95 P. 882, 17 L. R. A. (N. S.) 1018. Defendants', averments in their cross- complaint regarding the origin of their easement may well be regarded as surplusage, and still their cross-complaint

meets the requirements of the rule laid down in the case of *Corea* v. *Higuera*, supra.

It thus follows that the decree entered herein as to the disputed tract of land should be, and the same is, reversed. The trial court is directed to make findings of fact and conclusions of law in conformity herewith and to enter a decree quieting plaintiff's title to such land. The trial court is also directed to make findings of fact in conformity with the views herein expressed as to the source of defendants' easements across plaintiff's land. The decree as to such easements is affirmed. The total costs on this appeal shall be borne one-half by the appellant and one-half by the respondents.

THURMAN, C. J., and CHERRY, STRAUP, and GIDEON, JJ., concur.