# HOLMES v. JUDGE.

No. 1695.   Decided December 5, 1906 (87 Pac. 1009).

Boundaries—Establishment—Erection of Improvements and Fences—Long Acquiescence—Subsequent Surveys.—Improvements calculated to mark the boundary line between adjacent lots were erected by the owners of the lots and existed for more than thirty years, during all of which time rents for the ground upon which the improvements stood were collected by the owners, each for his own lot. A fence conforming to the boundary established by the improvements was also erected. Many years after this a survey of the lots was made and a new boundary was fixed, not coinciding with the fence. The line shown by the survey was determined from street monuments placed long after the improvements were made and the fence established. *Held*, that the line determined by the erection and continued existence of the improvements and fence, and acquiesced in by the owners, was the true boundary.

Appeal from District Court, Third District; C. W. Morse, Judge.

Action by G. S. Holmes against Mary Judge. From a judgment for plaintiff, defendant appeals.

Reversed and remanded.

*Henderson, Pierce, Critchlow & Barrette* for appellant.

*A. Howat* for respondent.

FRICK, J.

This is an action in equity, commenced by respondent, to quiet the title to a small strip of land alleged by him to be 2.1 feet wide on the south end, and 1.83 feet on the north end, and 47.93 feet in length north and south. Respondent alleges that he is the owner of the north 47.93 feet of lot 5, block 56, plat A. Salt Lake City survey, and the strip above mentioned is at the rear, or east, end of the part owned by him. Appellant alleges that she is the owner of the west

66x130 feet of lot 6, block and plat aforesaid. Lot 5 constitutes the northwest corner, and lot 6 the northeast corner, of said block. The east line of respondent's property and the west line of appellant's should be coincident, and the dispute in this case arises over the precise point at which the boundary line of said property is located. Respondent claims that the true boundary is east of said small strip, and that the strip belongs to him as part of lot 5, while the appellant claims the boundary to the west of said strip, and that the same belongs to her as part of lot 6. There is no dispute respecting the title of either party, except to the strip aforesaid. Such titles, however, are deraigned from different sources. In view of the fact that we shall treat this case as a disputed boundary, we need not refer to the pleadings any further than to say that each party claimed title to the disputed strip and asked for affirmative relief. At the hearing the trial court found the issues in favor of respondent, and upon findings of fact and conclusions of law duly made entered a judgment and decree quieting the title to said strip in respondent, from which judgment and decree this appeal is prosecuted.

Appellant duly filed a motion for a new trial, and, the same being overruled, preserved all the evidence in a bill of exceptions, which evidence, in that form, is now before us. There is no substantial or material conflict in the evidence, and therefore the question here is one purely of law applicable to the uncontroverted facts and circumstances, as they appear from the bill of exceptions. The undisputed facts may be briefly, yet comprehensively, stated as follows: Block 56 is one of the original blocks of Salt Lake City, with an area of 20x20 rods, and lot 5 aforesaid is bounded on the west by State street and on the north by Second South street, while lot 6 is bounded on the north by Second South street and on the east by Second East street. While it appears from the evidence that some improvements were made on both lots 5 and 6 prior to that time, patent was not issued thereto until June 1, 1872, when it was issued to Daniel H. Wells, as mayor of Salt Lake City, and he in September of that year

conveyed by proper deed said lot 5 to one John L. Blythe, who thus appears to have become the original owner and the predecessor in title of that part of lot 5 now claimed by respondent. The heirs of said Blythe conveyed to respondent in April, 1897. The history of the title to lot 6 is practically the same as that of lot 5, except that the title, after patent, was vested in one Joseph Busby, from whose estate, by means of intermediate grantors, appellant deraigns her title to her part of lot 6, dating from the 1st day of April, 1898. The record is silent as to when the original survey of said block 56 was made, nor does it appear anywhere what, if any, original monuments existed, or where such are located if any exist. It does appear, however, that shortly after this action was commenced a survey was made by a civil engineer, in December, 1904, and a plat of that survey was introduced in evidence and is made a part of the bill of exceptions. From the testimony of the surveyor it appears that he located the corners of lot 5 from monuments found by him at the intersection of the streets mentioned above, and that these monuments were established in the streets in 1890 by the then city engineer. There is no direct evidence that these monuments corresponded with the original ones established, if any were established, when the original survey of the block was made. It does appear, however, that the monuments that governed the survey of 1904 were those established in 1890 by the city engineer, and were doubtless assumed to be correct. It further appears, from the evidence of the surveyor who made the survey in 1904, that he found no monuments or indications of any at the northeast corner of lot 5 and the northwest corner of lot 6, and that he established the boundary line between said lots as claimed by respondent merely as an arbitrary line, and arrived at the point where he located the same by dividing block 56 into two equal parts, so as to make the frontage of lot 5 on Second South street 165 feet, and giving lot 6 the same number of feet on that street. This was presumably based upon the fact that respondent's deed calls for 165 feet east from the northwest corner of said lot 5, and that appellant's deed calls for 66 feet commencing at the north-

west corner of lot 6. Respondent proved by a witness, who is a son of John L. Blythe, the original owner of lot 5, that his father leased the northeast corner of lot 5 to one Ed. Gilman, and that said Gilman erected a house on the northeast corner thereof in the fall of 1871, and that said Gilman paid ground rent to his father during his lifetime, until about the year 1893, and thereafter to his father's estate. This witness further testified that, two or three years after 1871 one Cameron or one Hale erected a house on the northwest corner of lot 6, adjoining the house erected by Gilman; that these two houses were afterwards, from about the year 1880 until about the year 1895, used and occupied as one by cutting a door through the adjoining walls, and during that time were occupied in that way by one Dr. Gardner; that the house erected by Cameron or Hale, on what is now appellant's property, was still standing at the time of the trial. It appears from other testimony that the house erected by Gilman on respondent's property was torn down and removed a short time before the trial.

Appellant produced a Mrs. Carman as a witness, who is a daughter of the original owner of that part of lot 6 claimed by appellant. Mrs. Carman testified that she was born on the property owned by her father that is part of lot 6; that she had lived there all her life, with the exception of about seven years, from 1877 to about 1884, and that she was living there at the time of the trial; that she remembers the building that was erected on the northwest corner of lot 6; that it remained in the same position it was in at the time of the trial for more than 20 years last past; that a fence was erected, starting from the southwest corner of said building, extending south to the rear end of her father's property; that her father always claimed all that part of lot 6 lying east of said fence and up to the fence; that he collected ground rent for the land upon which the building stood during all of his life, and his estate did the same after his death; that the aforesaid fence was erected more than thirty years prior to the time of the trial, and was in the same place all the time. Mr. Romney, who purchased the property claimed by appellant from

the administrator of the estate of the original owner and suc-
ceeded to the title thereto in 1896, and who sold it to appel-
lant in 1898, testified that he was acquainted with the build-
ing and fence erected and standing along the west side of lot
6 ; that both were in the same place all of the time from 1896
to the time of the trial; that he claimed up to the fence, and
treated the fence and the west side of the building as the
boundary between lots 5 and 6.    Mr. Halloran, who is the
agent of appellant, and as such had charge of the property
for her, testified that he knew the location of the building and
fence for the past seven years prior to the trial, and that the
same were in the position then as when he first saw them; that
the appellant always claimed up to the fence, and claimed the
fence and the west side of the building as the west boundary
line of her property.    It further appears from the testimony
that the fence and the west side of the building are in a direct
line north and south, but that the direction of the fence and
house line vary a little from the line as established by the
surveyor in 1904.    It further appears from the testimony
that the line as marked by the fence and the west side of the
building is 1.85 feet west of the line as surveyed by the sur-
veyor at the north end, and 2.1 feet at the south end, thus
leaving a strip of 1.85 feet at one end and 2.1 feet at the
other end by 47.93 feet in length between the two lines, and
this is the strip in controversy.    It is further shown by the
testimony of a daughter of the original owner of lot 5 that
she lived on said lot in 1872 or 1873, and continued to live
there until 1877 ; that she is now forty-six years of age; that
the building on lot 5 occupied by Dr. Gardner was erected
about thirty-two years prior to the time of the trial, and that
the one on lot 6 was erected over twenty-five years prior to
the time of the trial; that her father always collected ground
rent for that part upon which the first building stood during
his lifetime.    The executor of John L. Blythe testified that
Dr. Gardner paid him as such executor, $8 a month as ground
rent for the northeast corner of lot 5.

We remark here that there is nothing in the evidence show-

ing that there ever was or was not a survey made establishing the east boundary of lot 5 and the west boundary of lot 6; nor is there anything to show how the building and fence came to be erected in the position they occupy; nor is there anything to show that there ever was any dispute between the owners of the property concerning the boundary line between said lots, or that any question was ever raised as to its location until such was done by respondent shortly before the bringing of this action. The evidence, however, does show that parts of both lots 5 and 6 were occupied continuously since 1872, and for some time prior thereto, and that the original owners lived thereon for many years, and thus knew or must have known of the fence and the claims of the respective owners, from what appeared upon the ground at least. The foregoing facts being undisputed, and substantially covering the case as made, nothing remains except to apply the law thereto, and from the law determine who is the legal owner of the strip of land in dispute. As before stated, we shall treat this case as a disputed boundary line case merely, since by the stipulation of the parties and from the evidence no other issue is presented. In view of the uncontroverted acts, the question is, where is the boundary line between lots 5 and 6? Is it where the same was located by the surveyor in December, 1904, or is it where the fence was erected along the west side of the building erected on lot 6?

Counsel for respondent contends that this is a case where a boundary line was established, if established at all, by mistake or by a misconception of the true line, and therefore the parties on either side of the line are, under the law, permitted to claim up to the true line whenever it is discovered. They further contend that there is nothing in this record upon which the doctrine of estoppel can be based, that the true boundary line was not established until shortly before the action was brought, that the same is at the point fixed by the survey of 1904, and that there never was an agreement between the adjoining owners fixing or agreeing upon a boundary line, and therefore respondent should prevail in this court, as he prevailed in the court below. Counsel further

urges that, the trial court having found the facts in favor of respondent, this court, in view of the case of *Promontory Ranch Co. v. Argile,* 28 Utah 398, 79 Pac. 47, and other cases, will not disturb a finding, unless clearly against the evidence and contrary to justice and right. If the findings and conclusions of the lower court were based upon conflicting evidence in any respect, we would have no hesitancy in agreeing with counsel's contention. But, in view that this record presents a question of law merely to be applied to uncontroverted facts, we cannot, even if we desired so to do, avoid the responsibility of applying the law, as we find it to be, to the facts as they exist. Counsel for appellant contend that in view of the undisputed facts in this case the law implies an agreement by the respective owners of the adjoining lots by which they established the boundary line to be the point where the fence and west side of the building on lot 6 were located.

The authorities upon the subject of disputed boundaries are, as might well be expected, not in harmony. Reasonably well defined principles, however, are established respecting the subject, and it is in the application of these principles to the particular case, rather than in any disagreement respecting the law, that the authorities differ. At the oral argument the writer, at least, was much impressed with the views contended for by counsel for respondent, and by the law as contended for by him; but upon a thorough reading of all the evidence, and a careful examination of all the authorities cited, as well as others, and upon mature reflection, he has been compelled to yield his first impressions, and we are all convinced that the law in this case is with the appellant upon the uncontroverted facts. We cannot, within the limits of this opinion, refer to more than a few of the many cases upon the subject. The lower court found that there never was any agreement between the owners of lots 5 and 6 respecting the boundary line in question, and in view of this fact permitted the respondent to recover.

Is such an agreement necessary in cases of this kind? Upon

this point Selden, J., in the case of *Baldwin v. Brown,* 16 N. Y., at page 363, says:

"The supposition of such an agreement [referring to an agreement establishing a boundary line] in cases of long acquiescence in an established line is, as I apprehend, entirely superfluous. The acquiescence in such cases affords ground, not merely for an inference of fact to go to the jury as evidence of an original parol agreement, but for a direct *legal inference as to the true boundary line.* It is held to be proof of so conclusive a nature that the party is precluded from offering any evidence to the contrary. Unless the acquiescence has continued for a sufficient length of time to become thus conclusive, it is of no importance. The rule seems to have been adopted as a rule of repose, with a view to the quieting of titles, and rests upon the same reason as our statute prohibiting the disturbance of an adverse possession which has continued for twenty years. In all cases in which practical locations have been confirmed upon evidence of this kind, the acquiescence has continued for a long period, rarely less than twenty years." (Italics ours.)

The foregoing case is even weaker in its facts than is the case at bar. In that case the contending parties claimed title from a common source, and by mistake located a division fence at a point not the true line, yet it was held that long acquiescence, in that case more than forty years, concluded the parties from questioning the boundary line. Cases are there cited where the period of acquiescence was for a much shorter time than is the time in the case at bar. Moreover it is expressly held in that case that the decision is not based upon adverse possession, but upon acquiescence alone. The case of *Reed v. Farr,* 35 N. Y. 113, is much like the foregoing in its facts, and cites and approves that case. The case of *Beardsley v. Crane* (Minn.), 54 N. W. 740, was a case of ejectment, and involved the question, in some respects, now under consideration. Collins, J., speaking for the Supreme Court of Minnesota, at page 742 of 54 N. W., right-hand column, says:

"There should be an express agreement made between the owners of the lands, deliberately settling the exact, precise line between them, and acquiescence for a considerable time, or, in the absence of proof of such agreement, it should be as clearly and distinctly shown that the party claiming has had possession of the premises claimed up to a certain,

visible, and well-known line, with the knowledge of the owner of the adjoining land, and his acquiescence, continued for a considerable period of time. What this period is has not been limited or defined, is quite vague and uncertain, and must necessarily depend upon the particular circumstances of each case."

The foregoing cases were cited by counsel for respondent upon the proposition that a mere passive assent and acquiescence is insufficient; that there must be more than that; that it must be or amount to an act or acts showing an actual acquiescence in the line as claimed. There is, however, nothing in those cases from which the law as claimed by counsel can be deduced, except now and then a loose expression may be found to that effect, and in view of all the authorities, when examined for the purpose of ascertaining what is actually decided, and the principles upon which the decisions rest, the contention of counsel is not supported to the full extent claimed by him. It is squarely held, however, that long acquiescence in a boundary that is visibly marked, or placed where it can be and is observed by the adjoining owner, is sufficient to establish a boundary from which neither party may depart at will.

The case of *McNamara v. Seaton,* 82 Ill. 498, is clearly distinguishable from the case at bar. In that case two brothers, owning adjoining farms, agreed upon a wrong boundary by mistake, but discovered their error within four years thereafter, and thenceforth disregarded such line, and each claimed to the true boundary. The grantee of one of the brothers afterwards sought to enforce the rule of agreed boundary, but his claim was disallowed by the court. The case of *Manistee Mfg. Co. v. Cogswell* (Mich.), 61 N. W. 884, did not present the question of a boundary by acquiescence. In that case the error was discovered after five years, and no consent or acquiescence is shown. *Palmer v. Osborne* (Iowa), 87 N. W. 712, is a boundary line case; but, owing to the fact that the claimed boundary was on land overgrown with brush and not visible, and the owner against whom the boundary was claimed being a nonresident of the state, and having no knowledge except that which the law presumes in respect to owner-

ship, the court held that the principle of established boundary by long acquiescence had no application. The court, however, in that case recognized the principle. The case of *Peters v. Reichenbach* (Wis.), 90 N. W. 184, is a case of ejectment for a small strip of ground between adjoining farmers. The case is certainly an authority for respondent, so far as the language of the court is concerned; but, even in that case, the doctrine we contend for is recognized, but seems not to have been followed. It is the only case, however, that goes to the extent of disregarding boundary lines, except such as are expressly agreed to or established by the parties owning the land. If that case were strictly followed, there would be no security except in absolutely correct boundary lines or in those that were made so by an absolute agreement. *Schraeder M. & M. Co. v. Packer*, 129 U. S. 688, 9 Supp. Ct. 385, 32 L. Ed. 760, is a case of a mistaken boundary in respect to uncultivated timber lands. It was held in that case that a party consenting that his agent might mark the boundary line, which was afterwards discovered to be wrong, did not constitute an estoppel and prevent the consenting party claiming to the true boundary when discovered. Long acquiescence is not considered in the case. *Schad v. Sharp* (Mo. Sup.), 8 S. W. 549, is another case where both parties claimed from a common grantor, and a fence was erected where it was supposed the boundary was which proved to be a mistake. The court simply held that no estoppel arose from that fact. Long acquiescence was not considered. *Hall v. Eaton* (Mass.), 29 N. E. 660, involved the construction of a deed, and the court held that under the facts in the case the question of a practical location of a boundary was not permissible in view of the facts. *Brown v. Bowerman* (Mich.), 97 N. W. 352, was a case of ejectment, and was reversed upon the ground that the court did not submit to the jury the question as to whether the boundary line had been established by the parties. *McMaster v. Morse*, 18 Utah 21, 55 Pac. 70, presents nothing favorable to respondent. That case was reversed because the court refused to allow the jury to pass upon evidence respecting the boundary line in question.

We have thus briefly reviewed all the cases cited by counsel for respondent, and we will now proceed to examine a few other cases upon this subject.    There are numerous authorities which hold that, in cases where the facts and circumstances were practically as they appear from the record in this case, a boundary between owners of lands, if marked by a fence or other visible monument, and acquiesced in by the owners for a long period of years, constitutes the true boundary, and that courts will not. permit such boundaries to be disturbed.    In *Diehl v. Zanger,* 39 Mich. 601, Judge Cooley, in passing upon this question, in the concluding paragraph of the opinion, at page 606, says:

"But another view should have been equally conclusive in this case. The long practical acquiescence of the parties concerned in supposed boundary lines should be regarded as such an agreement upon them as to be conclusive, even if originally located erroneously."

In *Husted v. Willoughby,* 75 N. W. 279, the same court held that, where a boundary line was located by mistake by one party and acquiesced in for more than fifteen years, such boundary will not be disturbed.    In a recent case in New York (*Katz v. Kaiser,* 48 N. E. 532) the case of *Baldwin v. Brown,* supra, is approved and followed.    The following cases are all to the same effect: *Palmer v. Dosch* (Ind. Sup.), 47 N. E. 176; *Holloran v. Holloran* (Mass.), 21 N. E. 374.    In the case of *Miller v. Mills County,* 82 N. W. 1038, the Supreme Court of Iowa makes a thorough review of the authorities and holds that long acquiescence in a visibly marked boundary line between owners becomes conclusive.    The same court, in a later case, entitled *Kulas v. McHugh,* 86 N. W. 288, in the syllabus, states the rule as follows:

"Where a division fence between adjoining owners has stood for over ten years, each party claiming to own up to it, an agreement to make it the true boundary·will be implied."

In the case at bar the improvements were made more than thirty years before the trial.    These improvements, although of no great value, were erected in such a way that they were

calculated to mark the boundary between lots 5 and 6. The owners of these lots collected ground rent for the ground upon which the improvements stood, each for his own ground, during all of the time the original owners lived, and their representatives continued to do the same, and as they were succeeded by other owners the same practice was continued until respondent made his claim, more than thirty years after the first improvements were made. In addition to this a fence was erected which so nearly approximated the true division line between the land that no one could have done otherwise than assume that this fence was intended as the true boundary. The evidence shows that the children of both the original owners lived upon the properties when quite small, thus leaving the inference that the families of the owners lived there for many years at least, and thus not only acquiesced in, but must have recognized, the fence as the boundary. Certainly it was open and visible to all for all those years, and no one seems to have raised any question respecting the boundary, or that the fence did not constitute the true division line, until the respondent did so.

Counsel for respondent, however, contend that the improvements and fence were erected by tenants and that the owners are not to be bound, by the acts of such tenants. Grant this, and there remains the fact that the owners and their successors and grantees by implication of law adopted the acts of these tenants by acquiescing therein for more than thirty years. The record does not show who constructed the fence, nor who requested it to be built, except by mere inference. But it does appear that the owners and their successors in interest must have seen and known of its existence during all of the time it was there. Neither can it be inferred, as counsel suggests, that the fence was erected merly for convenience, and not with a view of establishing a boundary, for the reason that the fence so nearly approximates the line as now claimed by respondent that such an inference is left without any force whatever. But the evidence is not satisfactory that the true division line is where it is claimed to be by respondent. True, the surveyor says that it was determined from the

street monuments, but he also says that these monuments were placed in 1890, long after the improvements were made and the fence established. But if we assume, for the purpose of this case, the true line to be at the point fixed by the surveyor in 1904, still the result must be the same, upon the ground that the fence line has been too long established and recognized without question as the boundary to be now disturbed. To do so in this case would unsettle boundaries long acquiesced in by the original owners, if by a later survey it were found that the true boundary varied to any extent from the one acquiesced in by such owners. If the rule of established boundaries by long acquiescence was adopted "as a rule of repose with a view of the quieting of titles," and we believe that it rests upon sound public policy, with a view of preventing strife and litigation concerning boundaries, then this case is, 'as we view it, one where the rule should be enforced.

While, as all the authorities agree, no hard and fast rule can be laid down to control in every case, but that each case must be determined by its own peculiar facts and circumstances, still where, as in this case, the facts respecting the acquiescence for so many years, and the open and visible boundary is so clearly established, and the knowledge thereof by interested parties is so clearly shown, the general principles recognized by all authorities apply with full force, and we cannot do otherwise than to give them effect. We do not wish to be understood as holding that parties may not claim to the true boundary, where an assumed or agreed boundary is located through mistake or inadvertence, or where it is clear that the line as located was not intended as a boundary, and where a boundary so located has not been acquiesced in for a long term of years by the parties in interest. But in all cases where the boundary is open, and visibly marked by monuments, fences, or buildings, and is knowingly acquiesced in for a long term of years, the law will imply an agreement fixing the boundary as located, and will not permit the parties or their grantees to depart from such line. These rules, of course, have no application where a party buys with a view to lines established by new or later surveys. As to such gran-

tees the new survey or lines, whether right or wrong, govern. This is so, however, because such a grantee bought, and his deed is made, with reference to the new lines, and not because the established boundaries may not be insisted on in all proper cases. While the interests of society require that the title to real estate shall not be transferred from the owner for slight cause, or otherwise than by law, these same interests demand that there shall be stability in boundaries, and that, where parties have for a long term of years acquiesced in a certain line between their own and their neighbors' property, they will not thereafter be permitted to say that what they permitted to appear as being established by and with their consent and agreement was in fact false.

The appellant asks for affirmative relief in her counterclaim, and prays that the title to the strip of land, as described therein, be quieted in her. The judgment is therefore reversed, and the case remanded to the district court, with directions to vacate the findings of fact and conclusions of law, and to substitute therefor findings of fact and conclusions of law in conformity to the views contained in the foregoing opinion, and that upon such findings and conclusions said court enter a judgment and decree quieting the title to the strip of land, as the same is described in appellant's counterclaim, in her. Costs to be taxed against respondent.

McCARTY, C. J., and STRAUP, J., concur.