## BROWN v. MILLINER.

No. 7434. Decided June 1, 1951. (232 P. 2d 202.)

See 11 C. J. S., Boundaries, sec. 116. Boundaries, parol agreement as to. 8 Am. Jur., Boundaries, sec. 73; 113 A. L. R., 423.

*John S. Boyden, Allen H. Tibbals,* Salt Lake City, for appellant.

*P. H. Neeley,* Coalville, for respondent.

WOLFE, Chief Justice.

This action was commenced by the appellant, plaintiff below, to establish the boundary line between a tract of land owned by him and adjoining land owned by the respondent, defendant below, in Summit County, Utah. The appellant claims title to the land in dispute under a deed while the respondent claims title under the doctrine of boundary by acquiescence and by adverse possession. From a judgment quieting title to the disputed area in the respondent, the appellant prosecutes this appeal. The appellant and respondent will hereafter be referred to as the plaintiff and the defendant, respectively.

In 1883, William Milliner, grandfather of the defendant, was the owner of the northeast quarter of the northeast quarter of Section 15, T. 2 S., R. 5 E., S. L. M. On September 19th of that year he conveyed to William J. Brown, grandfather of the plaintiff, a part of that quarter-quarter section, describing it by metes and bounds in the deed and stating it to contain 10.61320 acres, more or less. The tract thus conveyed is labeled #1 on the sketch appearing below.

William J. Brown, the grantee, retained ownership of the above described tract until his death in 1855. By a decree in probate in 1902, this property was distributed to

his son, William D. Brown, father of the plaintiff. In the decree of distribution the tract was described simply as

"that part of the Northeast quarter of the Northeast Quarter of Section 15 lying on the southwesterly side of the Weber River containing 10.61320 acres. All in Township 1, [sic] Sec. 15, South of Range 5 East, S. L. M."

William D. Brown conveyed this tract to his son, Thomas Edward Brown, the plaintiff, in 1938, describing it in the deed generally as

"part of the Northeast Quarter of the Northeast Quarter of [Section 15], Sketch of the N. E. ¼ of the N. E. ¼ of Sec. 15, T. 2 S., R. 5 E., S. L. M. lying on the southwesterly side of the Weber River."

By the same deed William D. Brown also conveyed to the plaintiff two adjoining quarter-quarter sections not involved in this suit. The total land conveyed was stated in the deed as constituting 90.61320 acres.

Both tracts #2 and #3 in the accompanying sketch were owned by William Milliner at his death and in 1909 were distributed by a decree in probate to his son, Joseph Milliner, father of the defendant. In 1928 the defendant acquired title to tract #3 by mesne conveyances from his father and in 1942 the latter conveyed tract #2 to him. Up to the time that the defendant acquired title to tracts #2 and #3, the descriptions in the conveyances in the chains of title to those two tracts apparently did not conflict with the description by metes and bounds of tract #1 as contained in the deed from William Milliner to William J. Brown in 1883. However, the descriptions contained in the deeds by which the defendant acquired title to tracts #2 and #3 in 1942 and in 1928, respectively, apparently overlap the description of tract #1. In the defendant's deed to tract #3, the property conveyed was described as beginning 756 feet south of the northeast corner of section 15; thence S. 88° 47' W. 1110 feet, more or less, to the center of the old channel of the Weber River; thence southeasterly along the

center line of said river channel 480 feet, more or less. The west boundary of the tract conveyed was thus designated as the center of the old channel of the Weber River. Similarly, in the defendant's deed to tract #2, the property conveyed was described as beginning 471.2 feet south of the northeast corner of section 15, and running thence S. 89° 45′ W. 950 feet to the old channel of the Weber River; thence following said river channel S. 10° 40′ E. 200 feet; thence S. 82° 00′ W. 150 feet; thence S. 18° 00′ W. 110 feet; etc. Here again the west boundary of the tract conveyed was described as the old channel of the Weber River.

As to the location of the "old channel of the Weber River," the parties at the trial below were in sharp dispute. The plaintiff introduced in evidence the deed to tract #1 from William Milliner to William J. Brown executed in 1883 on which there was a plat showing the location of the land conveyed in relation to the Weber River. The river is there shown to flow northwesterly in a single channel along the courses of tract #1 designated A, B and C on the sketch. Thus the plaintiff contended that the river as located on that plat was the "old channel" referred to in the defendant's deeds to tracts #2 and #3. However, the defendant adduced evidence, and the lower court found, that in 1883 and up until 1920, the Weber River ran in the two channels shown in the above sketch, that the "old channel" was the main channel at that time, and that it coursed through the center of tract #1 as shown by the sketch. In 1920 Summit County diverted the water from the old channel into the east or present channel. Since that time only during the high water season does any water from the river enter the old channel.

It will be noted that in the defendant's deed to tract #2, the old channel is described as being S. 89° 45′ W. 950 feet from the east section line and in the defendant's deed to tract #3 the call to the old channel is S. 88° 47′ W. 1110 feet from the east section line. As shown in the sketch,

the actual distance along the north boundaries of these tracts from the east section line to the old channel, as located by the lower court, is considerably farther than the calls in the deeds, and the actual course of the old channel does not conform with the courses set forth in the defendant's deed to tract #2. Despite these discrepancies in courses and distances, the defendant contended that the old channel of the Weber River was a natural boundary monument and that it took precedence over the courses and distances called for in the deeds. It is unnecessary for us to decide the merit of that contention since the defendant readily admits that his title by deed, if any, to the overlapping area is junior to the title by deed held by the plaintiff, and that he must succeed, if at all, in this action by establishing a new or original title to that area either by adverse possession or under the doctrine of boundary by acquiescence. It suffices, therefore, that the reader carry into the remainder of this opinion only the knowledge that the descriptions in the defendant's deeds to tracts #2 and #3 apparently overlap the description of tract #1 as contained in the plaintiff's chain of title. The only question in this case is whether the defendant can, under the facts, establish title to the overlapping or disputed portion by virtue of the doctrine of boundary by acquiescence or by adverse possession against the record title of the plaintiff. The evidence adduced by the defendant in support of his claims of title and the applicable law will now be considered.

The overlapping area is labeled the "disputed area" on the sketch. It lies between the two channels of the river and has been and is now generally covered with brush. Competent evidence was introduced by the defendant that from at least 1883 to the time of the commencement of this action, he and his predecessors in title have pastured and occupied this area, and on occasions have cleared brush and harvested wild hay therefrom. The plaintiff and his predecessors in title to tract #1 from 1883 to the time of this action have farmed such part of that tract as could be

cultivated and up until 1930, at least, uninterruptedly used the disputed area, which could not be cultivated, for the grazing of animals in the spring before the crops on adjoining lands were planted and in the autumn after they were harvested. It is not disputed that it was the custom in that locality for residents to let their livestock run at large on the unfenced land along the river in the early spring and in the autumn. There had never been a fence between the east boundary of tract #1 and the west boundary of tracts #2 and #3 until 1930 when the defendant erected a fence substantially along the old channel of the Weber River as located by the lower court. At that time the defendant was the owner of tract #3; the defendant's father, Joseph Milliner, owned Tract #2; and William D. Brown, father of the plaintiff, owned tract #1. The plaintiff testified that while he was at his father's home to attend his mother's funeral, he went out to look at the farm and found the defendant preparing to build a fence. He asked the defendant what he was going to do and the latter replied that he had bought that ground, had had it surveyed and was going to fence off a cow pasture. The plaintiff replied that he did not think that the defendant owned it and that if he put up a fence, it would be under protest. The defendant's version of the same conversation was that the plaintiff came along just as he had finished building the fence, asked him what he was doing, and that there was no further conversation had. The defendant's wife testified that she was present at the time. She corroborated her husband's testimony as to what was said between the plaintiff and the defendant. About four to five years before the trial of this action, part of the fence along the south end of the disputed area burned and the plaintiff rebuilt the fence about a rod further north into the disputed area. There is no evidence that the defendant objected to this change in location.

It was stipulated by the plaintiff and the defendant that prior to the year 1939, they and their predecessors in title

paid all of the taxes levied against their respective tracts of property under an assessment which merely designated the quarter section within which the land was embraced. But commencing 1939 and up until the date of the trial, the defendant and his predecessors in title paid the taxes under the specific descriptions contained in the deeds by which he acquired title to tracts #2 and #3, and the plaintiff paid taxes under the specific description contained in the deed from Wm. Milliner to Wm. J. Brown in 1883.

The lower court found that for more than sixty years prior to the commencement of this action, the plaintiff, the defendant and their respective predecessors in title had mutually recognized and acquiesced in the old channel of the Weber River, (as located by the court) as the boundary line between their respective properties, concluded as a matter of law that the plaintiff, therefore, had no legal interest in the land embraced within the disputed area, and quieted title to that area in the defendant. The court also held that the defendant had acquired title to the disputed area by adverse possession. The plaintiff upon this appeal assails both grounds of the court's holding as insufficient under the evidence.

A review of the Utah cases involving boundary disputes reveals that it has long been recognized in this state that when the location of the true boundary between two adjoining tracts of land is unknown, uncertain or in dispute, the owners thereof may, by parol agreement, establish the boundary line and thereby irrevocably bind themselves and their grantees. *Rydalch* v. *Anderson*, 37 Utah 99, 107 P. 25; *Tripp* v. *Bagley*, 74 Utah 57, 267 P. 912, 69 A. L. R. 1417. In the latter case this court pointed out that when the location of the true boundary is known to the adjoining owners any parol agreement between them establishing the boundary elsewhere would be an attempt to transfer an interest in realty without complying with the statute of frauds. But, we stated, if the location of the true boundary is not known to the

adjoining owners, a parol agreement between them fixing its location is not regarded as transferring an interest in land but merely determining the location of existing estates.

We have further held in this state that in the absence of evidence that the owners of adjoining property or their predecessors in interest ever expressly agreed as to the location of the boundary between them, if they have occupied their respective premises up to an open boundary line visibly marked by monuments, fences or building for a long period of time and mutually recognized it as the dividing line between them, the law will imply an agreement fixing the boundary as located, if it can do so consistently with the facts appearing, and will not permit the parties nor their grantees to depart from such line. *Holmes* v. *Judge*, 31 Utah 269, 87 P. 1009. This rule is sometimes referred to as the doctrine of boundary by acquiescence. In the recent case of *Glenn* v. *Whitney*, 116 Utah 267, 209 P. 2d 257, Mr. Justice Latimer explained that the rule is bottomed on the fiction that at some time in the past the adjoining owners were in dispute or uncertain as to the location of the true boundary and that they compromised their differences by agreeing upon the recognized boundary as the dividing line between their properties. In *Holmes* v. *Judge*, supra, we declared that the doctrine of boundary by acquiescence

"rests upon sound public policy, with a view of preventing strife and litigation concerning boundaries"

and that

"While the interests of society require that the title to real estate shall not be transferred from the owner for slight cause, or otherwise than by law, these same interests demand that there shall be stability in boundaries".

However in that case we were careful to mark off the limits of the rule. Said the court:

"We do not wish to be understood as holding that the parties may not claim to the true boundary, where an assumed or agreed boun-

dary is located through mistake or inadvertence, or where it is clear that the line as located was not intended as a boundary, and where a boundary so located has not been acquiesced in for a long term of years by the parties in interest." [31 Utah 269, 87 P. 1014].

In the following Utah cases the rule of *Holmes* v. *Judge*, supra, was held to be applicable: *Moyer* v. *Langton*, 37 Utah 9, 106 P. 508; *Young* v. *Hyland*, 37 Utah 229, 108 P. 1124; *Farr Development Co.* v. *Thomas*, 41 Utah 1, 122 P. 906; *Binford* v. *Eccles*, 41 Utah 452, 126 P. 333; *Christensen* v. *Beutler*, 42 Utah 392, 131 P. 666; *Tanner* v. *Stratton*, 44 Utah 253, 139 P. 940; *Warren* v. *Mazzuchi*, 45 Utah 612, 148 P. 360; *Bartholomew* v. *Pickett*, 51 Utah 312, 170 P. 65; *Van Cott* v. *Casper*, 53 Utah 161, 176 P. 849; *Davis* v. *Lynham*, 67 Utah 283, 247 P. 294; *Willie* v. *Local Realty Co.*, 110 Utah 529, 175 P. 2d 718; *Malauf* v. *Fischer*, 108 Utah 355, 159 P. 2d 881. In other cases decided by this court the rule was recognized but held not applicable under the evidence: *Rieske* v. *Hoover*, 53 Utah 87, 177 P. 228; *Carlston* v. *Torkelson*, 69 Utah 261, 253 P. 904; *Peterson* v. *Johnson*, 84 Utah 89, 34 P. 2d 697; *Nelson* v. *DaRouch*, 87 Utah 457, 50 P. 2d 273; *Briem* v. *Smith*, 100 Utah 213, 112 P. 2d 145; *Home Owners' Loan Corporation* v. *Dudley*, 105 Utah 208, 141 P. 2d 160; *Glenn* v. *Whitney*, supra.

In *Home Owners' Loan Corporation* v. *Dudley*, supra, there was evidence that a fence line, which it was contended had long been acquiesced in as the boundary, had been erected at a time when the land on both sides of the fence was owned by the same person; in *Peterson* v. *Johnson*, it was proved that the fence in question had been erected when the property on one side thereof was part of the public domain; and in *Glenn* v. *Whitney*, supra, a fence, urged to be a long-recognized boundary, was shown by the evidence to have been erected by a person who never owned the property on either side of the fence. In all three of these cases this court held that the doctrine of boundary of acquiescence was not applicable because in view of the evidence there was no room for any implication that the

fence line had been erected by adjoining owners pursuant to an agreement between them as to the location of the boundary between them.

In some of the opinions of this court on the subject of disputed boundaries, there are statements to the effect that the location of the true boundary must be uncertain, unknown or in dispute before an agreement between the adjoining land owners fixing the boundary will be upheld, citing *Tripp* v. *Bagley,* supra, in support thereof. Such statements should be understood to mean that if the location of the true boundary line is known to the adjoining owners, they cannot by parol agreement establish the boundary elsewhere. As was pointed out in the *Tripp* case, such an agreement would be in contravention of the statute of frauds. But the *Tripp* case does not require a party relying upon a boundary which has been acquiesced in for a long period of time to produce evidence that the location of the true boundary was ever unknown, uncertain or in dispute. That the true boundary was uncertain or in dispute and that the parties agreed upon the recognized boundary as the dividing line will be implied from the parties' long acquiescence. *Roberts* v. *Brae*, 5 Cal. 2d 356, 54 P. 2d 698. In *Holmes* v. *Judge,* supra, this court, speaking through Mr. Justice Frick, set forth the following requirements necessary to establish a boundary by acquiescence. The line must be open, visible, marked by monuments, fences or buildings and recognized as the boundary for a long term of years. It was expressly stated by the court in that case that there was no evidence how the fence and building which were recognized as the boundary came to be erected, or that there was ever any dispute between the adjoining owners concerning the location of the true boundary, or that any question was ever raised as to its location until shortly before the plaintiff commenced his action.

Reverting now to the instant case, we think the record fails to sustain the lower court's finding that for more than

sixty years prior to the commencement of this action, the old channel of the Weber River was mutually recognized and acquiesced in as the boundary between the ▆▆▆ property now owned by the plaintiff and the defendant. Prior to 1930 when the defendant constructed a wire fence substantially along the center of the old channel, it appears that the defendant's predecessors in title claimed ownership of the disputed land and that they uninterruptedly pastured that area, harvested wild hay therefrom and leased it to others. But the record is devoid of evidence that the plaintiff's predecessors in title prior to the construction of the fence regarded the old channel as the boundary. On the contrary, their conduct was consistent with a claim of ownership of the disputed area. It is admitted that in the spring before crops on adjoining lands were planted and in the autumn after the crops were harvested, the plaintiff's father and grandfather pastured the disputed area which was the only practical use which could be made of that unfenced brush land. Counsel for the defendant argues that because it was the custom for livestock to run at large and graze the unfenced land along the river, including the disputed area, the grazing of that area by the plaintiff's predecessors did not evidence an intention on their part not to respect the old channel as the boundary line. We cannot agree with this argument. The fact that a landowner allows others to share with him the use of his land does not necessarily signify a disclaimer of ownership. And this is perhaps even more true when, as in the instant case the location of the true boundary does not appear to have been known to the adjoining owners. A person should be presumed to claim title to all the land called for by his deed unless it clearly appears otherwise.

The defendant contends that an incident which purportedly occurred some time between 1926 and 1929 indicates a recognition of the old channel as the boundary by the plaintiff's father. One James H. Salisbury testified that he was herding sheep on the disputed area, having leased it from John and Ralph Milliner (defendant's predecessors

in title), when W. D. Brown, the plaintiff's father, approached him and said: "You are a pretty good fellow if the public let you be." Salisbury replied, "I have always tried to keep on good terms with everybody." Then Mr. Brown responded, "If you stay on that [the east] side of the old channel, you will keep on good terms with me." Salisbury testified that he thought this conversation took place in about 1928 or 1929, although he thought it was in 1926, 1927 or 1928 when he leased the ground from the Milliners. The difficulty with this declaration allegedly made by the plaintiff's father is that it does not evidence any definite intention on his part but is subject to at least two different interpretations. He may have meant, as contended by the defendant, that he did not claim ownership of the land on the east side of the old channel, or he may equally as well have meant merely that he did not object to Mr. Salisbury grazing the disputed area but not that he intended to renounce all claims of ownership to it. Thus we conclude that the evidence fails to establish that there was any mutual acquiescene in the old channel as a boundary prior to 1930.

Does the fence which was constructed by the defendant in the old Channel constitute a boundary line from which the parties may not now depart? That question must be answered in the negative. No claim is made by the defendant that he erected the fence pursuant to an express agreement with the plaintiff's father, who was then the owner of tract #1, as to where the boundary should be located. Nor can it be implied that such an agreement ever took place as in *Holmes* v. *Judge,* supra, and the cases following it cited above. The defendant, who personally built the fence, does not contend that he ever as much as had a discussion with the plaintiff or his father concerning the location of the boundary between them. He testified, and his wife corroborated him, that when he had finished building the fence the plaintiff came along and inquired what he (the defendant) was doing and that nothing more was said. Were the record silent as to the circumstances surrounding the erection of the fence there might be room

to imply that it was built in pursuance of an agreement between the adjoining owners as to the location of the boundary between them, such as was done in *Holmes* v. *Judge*, supra. But in the instant case, as in *Peterson* v. *Johnson*, supra; *Home Owners' Loan Corporation* v. *Dudley*, supra; and *Glenn* v. *Whitney*, supra, there is no room under the evidence for such an implication to be drawn. Thus we conclude that the doctrine of boundary by acquiescence has no application under the evidence.

Considering now the finding of the lower court that the defendant had established title to the disputed area by adverse possession, we are convinced that the record does not sustain such a conclusion. A short answer to the defendant's claim of ownership by adverse possession is that his possession was never exclusive of the possession of the plaintiff. It is admitted by the defendant that the fence which he constructed was not built to exclude and did not exclude the plaintiff's and his father's sheep from continuing to graze the area in dispute. At times as many as 200 of the plaintiff's sheep grazed that area in the spring before crops on adjoining lands were planted and in the autumn after the harvest. It is true that the defendant testified that upon one occasion the plaintiff gave him half a mutton for the feed eaten by his (the plaintiff's) sheep on the defendant's land on the "other side of the river." There is no evidence when this incident took place. We would not be warranted in assuming from that one incident that the possession of the plaintiff was always subordinate to the possession of the defendant.

The judgment below is reversed and the case is remanded to the trial court with directions to enter findings in favor of the plaintiff consistent with this opinion. Costs awarded to the appellant.

WADE, LATIMER, and McDONOUGH, JJ., concur.

CROCKETT, J., being disqualified, did not participate herein.