Charles C. ENGLERT and Jo Ann
Englert, husband and wife,
Plaintiffs and Appellants,

v.

Henry E. ZANE and Dorothy G. Zane,
husband and wife; and John A. McNeil
and Kathy McNeil, husband and wife,
Defendants and Appellees.

No. 920448–CA.

Court of Appeals of Utah.

Feb. 18, 1993.

Phillip L. Foremaster, St. George, for plaintiffs and appellants.

Michael D. Hughes, St. George, for defendants and appellees.

Before BILLINGS, GARFF and GREENWOOD, JJ.

GREENWOOD, Judge:

Plaintiffs, Charles C. and Jo Ann Englert, appeal a judgment resolving their property dispute with adjoining landowners, co-defendants, Henry E. and Dorothy G. Zane and John A. and Kathy McNeil. We affirm the decision awarding the first disputed parcel to the Zanes through boundary by acquiescence and the second parcel to the McNeils by quiet title subject to their compensating plaintiffs for the land to be acquired.

## BACKGROUND

A land ownership dispute arose when plaintiffs' prepurchase survey demonstrated that co-defendants' homes encroached on building lots which plaintiffs purchased. The contested property had originally been subdivided in the mid–1960's by then-owners Russell and Patricia Walter, when they created the Brookside Summer Homes Subdivision on their tract of land in Veyo, Washington County, Utah. In planning this subdivision, Mr. Walter had hired a surveyor, instructing him to use the Santa Clara River traversing the property as a boundary for building lots to be platted on either side of the river. Although the surveyor did not mark the river on the completed subdivision map, Mr. Walter assumed that the meandering border down the center of the subdivision reflected his expressed intent that the common boundary of the lots that fronted on the river should be the center line of the river.

Based upon this assumption, Mr. Walter informed each buyer, including the predecessors in interest of both plaintiffs and co-defendants, that they were acquiring title to the river center and nothing on the other side of the river. To guarantee this boundary line in the event that the river's course should change, he inserted, in most of the subdivision deeds, a reservation stating: "less any part crossing the Santa Clara River."[1]

Despite these assumptions, representations and reservations, a problem arose in 1988 when plaintiffs' resurvey showed that the river was not, in fact, the boundary between adjoining Lots 6 and 7 on one side of the river and Lots 12 and 13 on the other side. Instead, Lots 12 and 13 extended beyond the river to include two additional portions of property, one formerly considered part of Lot 6 and the other considered part of Lot 7. The two homes, one thought

---

**1.** This reservation appeared in the chain of title of one of the two disputed parcels in this suit.

to be situated on Lot 6 and the other on Lot 7, actually straddled the boundary line between those lots and Lots 12 and 13. A dispute then arose between plaintiffs who purchased Lots 12 and 13 and co-defendants, the Zanes and the McNeils.

Mr. Walter first sold Lot 7 to the Karrs, predecessors in interest to the Zanes. The Karrs immediately took possession of the property, began using it for recreational pursuits and access to the river, and landscaped and groomed the area to the water's edge. They also constructed a house on the lot which they completed at least by the beginning of 1968.

Shortly after selling Lot 7, Mr. Walter sold Lot 6, eventually purchased by the McNeils, to the Meyers. Although evidence did not establish either the exact date of this sale or when the Meyers placed a mobile home on the building lot, the county tax records indicate the presence of the mobile home in 1970. The Meyers' use of their property extended to the water's edge in the same manner as the Karrs'. This use of both disputed parcels of land continued through various owners including both co-defendants. No one prior to plaintiffs ever objected.

On July 1, 1988, plaintiffs' offer to purchase the undeveloped Lots 12 and 13 was accepted by then-owner Mrs. Wertz. At that time, the parties to the sale assumed the center of the Santa Clara River was the boundary dividing Lots 12 and 13 from Lots 6 and 7. Plaintiffs, however, both sophisticated real estate buyers, retained their own surveyor to check the location of Lots 12 and 13. Resurvey results, available before closing, indicated, as stated above, that Lots 12 and 13 extended beyond the river and included property upon which portions of co-defendants' homes were situated.

Plaintiffs sued co-defendants, requesting that the court order the removal of the alleged encroaching structures and award them attorney fees. Co-defendants answered that plaintiffs had no cause of action and raised several affirmative defenses including:

1. Adverse possession;

2. Statute of limitations;

3. Boundary by acquiescence;

4. Boundary by agreement; and

5. Prescriptive easement (profit a prendre).

After a two day bench trial, the court made the following findings of fact. The subdivider, the County Tax Assessor[2], and all of the parties' predecessors assumed that the river constituted the boundary between the various pieces of property, although a routine survey would have shown the discrepancy. As the subdivision was actually platted, the river bisected Lots 12 and 13, isolating small parcels of those lots which were unsuitable for construction and effectively inaccessible from the main portions of Lots 12 and 13. The home currently owned by the Zanes encroached onto Lot 12, but had been constructed more than twenty years before the filing of this lawsuit. The McNeils' home, which straddled the boundary between Lot 6 and the intersection of Lot 12 and 13, was less than twenty years old. The encroaching structures, each valued at between $80,000.00 and $85,000.00, would be destroyed or severely damaged by removal from their present site. Testimony and on-site inspection indicated that the recreational and gardening use of Lots 6 and 7 suited the nature of the property and continued uninterrupted in the pattern set by co-defendants' predecessors. Plaintiffs were aware of the boundary dispute at the time they purchased Lots 12 and 13 for $22,900.00.

**2.** The Washington County Assessor assumed that the river served as the boundary between Lots 6 and 7 on one side of the river and Lots 12 and 13 which abutted Lots 6 and 7 across the river. The county, however, assessed taxes on the location of the property lines as shown on the subdivision plat recorded in the County Recorder's Office, not on the location of the river. Therefore, co-defendants and their predecessors paid the improvements taxes assessed on the buildings encroaching on the disputed property, while plaintiffs' predecessors paid the real estate taxes on the land upon which the houses were situated.

Plaintiffs had not yet undertaken any construction of improvements on Lots 12 and 13 and the main, undisputed portions of those lots were sufficient to accommodate the residence plaintiffs testified they intended to build.

Based upon these facts, the trial court quieted title in the Zanes because they had acquired title based either on the doctrine of boundary by acquiescence or on the doctrine of profit a prendre. As to the parcel contested by the McNeils, the court became convinced, in weighing the equities of the situation, that "requiring removal of the encroaching structures would not do equity" and determined that plaintiffs had an adequate remedy at law. The court, therefore, ordered that title to the property claimed by the McNeils be quieted in their favor after they compensated plaintiffs for the land awarded to them.

Plaintiffs appeal this decision claiming three errors:

(1) the trial court erred in applying the doctrine of boundary by acquiescence to the property awarded to the Zanes;

(2) the trial court abused its discretion in refusing to give plaintiffs injunctive relief ordering removal of the McNeils' encroachment; and

(3) the trial court erred in allocating to the McNeils more real estate than necessary to accommodate their encroachment when electing to award plaintiffs the legal remedy of damages in lieu of injunctive relief.

## STANDARD OF REVIEW

█ " '[I]n equity cases appeal may be had on the facts as well as the law.' " *Parks Enters., Inc. v. New Century Realty, Inc.*, 652 P.2d 918, 920 (Utah 1982) (quoting *McBride v. McBride*, 581 P.2d 996, 997 (Utah 1978)). On appeal in actions of equity, a reviewing court may set aside

findings of fact only if they are clearly erroneous. *Grayson Roper Ltd. v. Finlinson*, 782 P.2d 467, 470 (Utah 1989); *Reid v. Mutual of Omaha Ins. Co.*, 776 P.2d 896, 899 (Utah 1989); *see* Utah R.Civ.P. 52(a). "A finding is clearly erroneous if it is against the great weight of evidence or if the court is otherwise definitely and firmly convinced that a mistake has been made." *Bountiful v. Riley*, 784 P.2d 1174, 1175 (Utah 1989). The reviewing court gives due regard " 'to the opportunity of the trial court to judge the credibility of the witnesses.' " *Reid*, 776 P.2d at 899 (quoting Utah R.Civ.P. 52(a)); *Grayson Roper Ltd.*, 782 P.2d at 470. On the other hand, even in an equity action, we review the trial court's legal conclusions under a correction-of-error standard according those conclusions no particular deference. *Bellon v. Malnar*, 808 P.2d 1089, 1092 (Utah 1991); *Grayson Roper Ltd.*, 782 P.2d at 470.

## ANALYSIS

### Boundary by Acquiescence

█ The trial court determined that title to the parcel of land claimed by the Zanes could be quieted in them on the basis of boundary by acquiescence. Utah courts consider this doctrine "as a foundational one relating to rights based on actual possession of land." *Olsen v. Park Daughters' Inv. Co.*, 29 Utah 2d 421, 511 P.2d 145, 147 (1973). Its elements include: " '(1) occupation up to a visible line marked by monuments, fences, or buildings, (2) mutual acquiescence in the line as a boundary, (3) for a long period of time, (4) by adjoining landowners.' " *Staker v. Ainsworth*, 785 P.2d 417, 420 (Utah 1990)[3] (quoting *Goodman v. Wilkinson*, 629 P.2d 447, 448 (Utah 1981).

█ Utah courts have always restrictively applied this doctrine. *Staker*, 785 P.2d at 423. A party claiming title by acquiescence must establish all of the required

---

**3.** At one time the Utah Supreme Court added a fifth element to boundary by acquiescence requiring "objective uncertainty" about the location of the correct boundary. *Halladay v. Cluff,* 685 P.2d 500, 504–05 (Utah 1984). The supreme court later eliminated the additional element as a requirement of the doctrine. *Staker,* 785 P.2d at 424.

elements to give rise to a presumption of ownership in his or her favor. *Fuoco v. Williams*, 421 P.2d 944, 946 (Utah 1966). However, if these elements are met, then "the law will imply an agreement fixing the boundary as located." *Brown v. Milliner*, 120 Utah 16, 232 P.2d 202, 207 (1951).

Although plaintiffs do not dispute the twenty year history of adjoining landowners' mutual acquiescence in the Santa Clara River as the boundary, they do dispute the Zanes' ability to satisfy the remaining elements of the doctrine. Plaintiffs claim that the trial court erred in applying boundary by acquiescence because evidence was insufficient to support a finding of occupation up to a visible line marked by monuments, fences or buildings. Their claim has both a legal and a factual component. First, plaintiffs assert that, as a matter of law, a river is an insufficient monument because it is a natural geographical feature, inadequate as a visible line and not intended to be used as a boundary. Second, plaintiffs claim that even if the river were considered the boundary line, there is insufficient evidence to support occupation to the river for the required length of time.

■ No Utah case has expressly held that a river is a sufficient monument for purposes of boundary by acquiescence. We find, however, that discussion and references in Utah cases, as well as the legal definitions of "monument" and "boundary" allow us to conclude that a river can be considered a monument that is cognizable as a boundary for purposes of this doctrine.

■ The Utah Supreme Court has stated that to be considered sufficiently *visible*, "[a] claimed boundary line by acquiescence must be open to observation." *Fuoco*, 421 P.2d at 946. A *monument* must be "some tangible landmark to indi-

cate a boundary ... [and] must have certain physical properties such as visibility, permanence, stability, and a definite location." *Id.* A *boundary line* "must be definite, certain and not speculative." *Id.*

This court has acknowledged that a riverbed has these characteristics, albeit in a case not involving boundary by acquiescence. *Baxter v. Utah Dept. of Transp.*, 783 P.2d 1045, 1049 (Utah App.1989) (finding a line down the center of a river adequate to describe the common boundary between counties), *cert. denied*, 795 P.2d 1138 (Utah 1990). The court stated that "where permanence is desirable, the 'centre of the main channel' provides a definitely locatable boundary since the riverbed itself has permanent features that are observable even if water does not flow in it year-round and even if the river subsequently changes course and follows a different channel." *Id.*

Furthermore, our supreme court has broadly construed the term boundary in the context of boundary by acquiescence as "a recognizable physical boundary of *any* character, which has been acquiesced in as a boundary for a long period of time."[4] *Olsen*, 511 P.2d at 147 (emphasis added). The court reasoned that "the policy of encouraging peace and good order and of discouraging trouble and controversy demands that that be accepted as the correct doctrine." *Id.*

We also note a boundary by acquiescence case in which our supreme court appeared to assume the legal adequacy of a river as a monument marking a boundary line. *See Brown*, 232 P.2d at 208–09. The case concerned a dispute over whether the old or the new channel of the Weber River actually constituted the boundary between neighboring properties prior to the erection of any artificial boundaries. *Id.* The *Brown* court "conclude[d] that the evidence fail[ed] to establish that there was any mutual acquiescence in the old channel as a boundary." *Id.* at 209. Its extensive anal-

**4.** The Nebraska Supreme Court has specifically stated that for purposes of boundary by acquiescence, mutual recognition of a natural barrier, specifically a river, functions identically to recognition of an artificial boundary such as a fence line. *Hammerly v. County of Dodge*, 186 Neb. 608, 185 N.W.2d 452, 456 (1971).

ysis in reaching this conclusion never questioned the legal adequacy of a river as a boundary monument, but rather focused on the factual sufficiency of evidence relevant to whether the parties acquiesced in the old river channel as the boundary. *Id.* at 208–09.

In *Fuoco v. Williams*, a boundary by acquiescence case, the Utah Supreme Court referred to 11 C.J.S. *Boundaries* § 5 in a footnote, as the source for the definition of a monument as "some tangible landmark established to indicate a boundary," which must have "certain physical properties such as visibility, permanence, and stability, and definite location, independent of measurements." *Fuoco*, 421 P.2d at 946 n. 7 (referring to 11 C.J.S. *Boundaries* § 5 (1938)). That commentary notes that monuments could be either natural or artificial, 11 C.J.S. *Boundaries* § 5, and goes on to define natural monuments as "objects permanent in character which are found on the land as they were placed by nature, such as ... streams and rivers." *Id.* at § 6.

Finally, we note that *Blacks Law Dictionary* defines both boundary and monument in terms of natural and artificial objects. *Boundary* includes "[e]very separation, natural or artificial, which marks the confines or line of division of two contiguous properties." *Blacks Law Dictionary* 186 (6th ed. 1990). *Natural Boundary* is "[a]ny formation or product of nature which may serve to define and fix one or more of the lines inclosing an estate or piece of property." *Id. Monument*, in real property law, includes "[a]ny physical object on ground which helps to establish location of boundary line called for; it may be either natural (*e.g.* trees, rivers, and other land features) or artificial." *Id.* at 1007.

Thus, both case law and legal commentary indicate that a river functions as a legally adequate boundary for purposes of boundary by acquiescence. Therefore, the trial court did not err as a matter of law in determining that the Santa Clara River constituted a monument marking the property boundary.

The trial court also addressed the factual issue of the adequacy of the Zanes' occupation of the disputed parcels and declared that their use of that land constituted occupation. Utah case law supports the trial court's assessment of the Zanes' pattern of use according to whether it was normal and appropriate for the character and location of land. *Brown*, 232 P.2d at 208 (assessing the adequacy of the parties' occupation while noting that pasturing was "the only practical use which could be made of that unfenced brush land"). Evidence and on-site inspection showed that the property in question had been used for gardening, recreation, and relaxation. The trial court did not abuse its discretion in determining that this particular use was appropriate to the nature of the land and sufficient to constitute occupation.

The period of time necessary to trigger boundary by acquiescence became the issue which determined the applicability of the doctrine to plaintiffs' dispute with each of the two defendants. Utah has held that the required period of time corresponds to the twenty year prescriptive period unless unusual circumstances would allow a shorter period to be deemed sufficient. *Hobson v. Panguitch Lake Corp.*, 530 P.2d 792, 795 (Utah 1975). The trial court found that the standard twenty year period was met by the Zanes, while the McNeils could only verify occupation for nineteen years. We conclude that the trial court did not abuse its discretion in finding that the Zanes presented substantial evidence to meet all elements of boundary by acquiescence.

## Damages vs. Injunctive Relief

In equity cases, trial courts have discretion in determining whether to grant injunctive relief or award damages to an aggrieved party. *Crimmons v. Simonds*, 636 P.2d 478, 480 (Utah 1981). Utah courts have outlined a "balance of injury" test to assist trial courts in determining which remedy to award.

Under that test, an equity court may exercise its discretion not to grant injunctive relief when the plaintiff is not irrepa-

rably harmed by the violation, the violation was innocent, defendants' cost of removal would be disproportionate and oppressive compared to the benefits plaintiffs would derive from it, and plaintiffs can be compensated by damages. *Id.* (citing *Papanikolas Bros. Ent. v. Sugarhouse Shopping Ctr. Ass'n,* 535 P.2d 1256 (Utah 1975)).

 In this case, we find that substantial evidence relevant to this criteria supports the trial court's decision to refuse to order the removal of the McNeils' encroachment. Plaintiffs' actions and advance notice indicate that they would not be irreparably harmed by the encroachment. Their predecessors in interest willingly purchased Lots 12 and 13 with the understanding that the lots extended only to the center line of the river, and plaintiffs made their offer to purchase with that same understanding. On the other hand, the McNeils are innocent possessors of the encroaching residence who neither constructed the house nor knew of its encroachment at the time of their purchase. While their home would be greatly damaged or totally destroyed by removal, plaintiffs' intended use and enjoyment of the undisputed remainder of the property would not be significantly hindered by allowing the encroachment to remain. Based on this evidence, we find that the trial court did not abuse its discretion in determining that the balance of equities weighed in favor of compensating plaintiffs through damages for the loss of the disputed piece of land.

Plaintiffs also claim that if equity would not require the removal of the McNeils' home, the trial court still erred by allocating the entire disputed portion to them. Plaintiffs claim that the court acted arbitrarily in returning the boundary line to the center of the Santa Clara River and erroneously neglected to consider what portion of plaintiffs' disputed real property was actually necessary to accommodate the McNeils' encroachment. We note, however, that plaintiffs' own expert provided the calculation of the square feet occupied by the McNeils' encroachment and that plain-

tiffs offered no evidence regarding any lesser portion of land for the court's consideration. It was, therefore, within the trial court's discretion to use plaintiffs' expert's testimony in determining what segment of land should remain with the McNeils.

## CONCLUSION

As a matter of law, the trial court did not err in considering the Santa Clara River an adequate monument for purposes of boundary by acquiescence. Because the Zanes presented sufficient evidence to meet all elements of that doctrine, the court did not abuse its discretion in quieting title of the disputed land in their favor. It also acted within its discretion in refusing to require the removal of the McNeils' encroachment and then awarding plaintiffs damages to compensate them for the land whose title the court ordered quieted in the McNeils.

We affirm.

BILLINGS and GARFF, JJ., concur.