378 P.2d 893

**Faun W. Quinney KING and William S. Thomas and Mary R. Thomas, his wife, Plaintiffs and Appellants,**

**v.**

**J. H. FRONK, Defendant and Respondent.**

No. 9662.

Supreme Court of Utah.

Feb. 21, 1963.

Hanson & Garrett, Salt Lake City, for appellants.

Sherma Hansen, Brigham City, W. Eugene Hansen, Salt Lake City, for respondent.

HENRIOD, Chief Justice.

Appeal from an action tried to the court in which plaintiffs sought title, by way of boundary by acquiescence, to a 5' 7" strip of land. The trial court concluded that the proof did not justify such claim, but that an easement had been established from the street line extending one-half the distance of the disputed area. Reversed, with no costs awarded.

Neither side pleaded or attempted to prove an easement. It was all or nothing for both. We agree not only that an ease-

ment should not have been awarded under such circumstances, but that the evidence did not show any easement, so that such conclusion must be reversed.

As to a boundary "by acquiescence," we conclude that such a boundary was established under the evidence reflected in the record, and so hold after examining the facts adduced in this case.

All of the witnesses were plaintiffs', although defendant Fronk and one other, previously called by plaintiffs, were examined by defendant as his own witnesses. In essence, it was more or less a cross-examination. No witness was called by defendant in refutation of plaintiffs' evidence, unless it could be said that an abstract of title to his adjoining property may have been designed to controvert plaintiffs' theory of the case.

The undisputed facts well may be abstracted as follows: Plaintiffs claim Lot 3, Tremonton, Utah, Plat "G." Defendant claims Lot 4 to the south. As platted, each lot calls for an area 50' x 145' abutting a public street. From 1915, date of the Plat, to 1926, ownership is unimportant. But in December, 1926, one Grauber acquired title to Lot 3. At that time there was a decrepit fence, presumably separating the lots, which was in line with the north wall of a barn situate on Lot 4. Together they appeared to be a boundary between the lots. Grauber found 3 old and weathered cedar posts in place. He installed posts and wire where

necessary. He considered the wall of the barn and the fence as the boundary at that time. The fence, though in disrepair, was visible. He purchased Lot 3 for $200. The strip, at that rate, roughly would have a $22.50 value in 1926 and represented but .02 of an acre. Grauber built a home on the lot, which he occupied, he said, for "about 5 years." Without bending a "more or less" time estimate, this would show occupancy to 1932. He said one Miller, owner of Lot 4, ran cows on Lot 4, during what period, either before or after Grauber's purchase of Lot 3, is not clear.

In 1933, Grauber mortgaged the property for $2,000. In 1936 he sold to one Thomas, releasing the mortgage. Thereupon Thomas occupied the premises and mortgaged it. During Grauber's occupancy he had constructed a concrete driveway from the street, and the south edge of such drive was in line with the old fence and the north wall of the barn. Thomas considered the physical features of barn, fence and drive as the boundary between the two lots. In 1941 he sold Lot 3 to one Pack, who mortgaged it the same day. In 1945 Pack sold to plaintiff King who mortgaged the property the next day. King is selling under contract to plaintiffs Thomas (unrelated to Thomas who was previously an owner in the chain of title).

It appears that in 1926, one Miller owned Lot 4. He died 4 months after

Grauber acquired Lot 3. However, his wife survived him, but died in 1933. Distribution was effected to the Millers' heirs in 1937. Lot 4 was then sold to a Dr. White in 1939, who in turn sold to Fronk in 1948. During White's ownership he kept cows on Lot 4, and was seen there occasionally. After Fronk acquired Lot 4 in 1948, he sporadically parked used cars up to but not beyond the fence line. Since 1926, no one in the chains of title on either side ever questioned the old fence or the line which visibly was marked in whole or in part at times by a barn's wall, a wire fence, shrubs and a concrete driveway. From 1948 to 1961, Fronk respected the line, and on uncontradicted testimony it seems evident that there was a visible boundary marked with monuments in 1926 that persisted without protest of any kind until 1961, when Fronk, in anticipation of constructing an apartment house, questioned it for the first time.

 Fronk urges that plaintiffs did not show occupancy of Lot 3 by one Pack for 4 years after he purchased in 1941. It is significant that Pack, unavailable to testify, nonetheless mortgaged the lot. This subsisted until he sold in 1945. Besides, a visible, persisting boundary having been shown over a long period of time is convincing evidence of an intended or acquiesced-in boundary. Under such circumstances, it would seem that in the nature of things it is incumbent upon him who assails it to show by competent evidence that a boundary was not thus established,[1] by virtue of lack of agreement between neighbors, which agreement is presumed by the passage of a long period of time;[2] that there could have been no such agreement by presumption because of sole ownership of property with an existing line marked by monuments, —nothing more, which property later was transferred in tracts to two or more other persons;[3] that the line claimed as a boundary by acquiescence actually was set for a purpose proven to be other than a boundary separating parcels;[4] possibly, that the parties in setting the boundary clearly were mistaken[5] on facts that would warrant re-

1. Motzkus v. Carroll, 7 Utah 2d 237, 322 P.2d 391 (1958).
2. Brown v. Milliner, 120 Utah 16, 232 P.2d 202 (1951).
3. Home Owners' Loan Corporation v. Dudley, 105 Utah 208, 141 P.2d 160 (1943); Briem v. Smith, 100 Utah 213, 112 P.2d 145 (1941).
4. Ringwood v. Bradford, 2 Utah 2d 119, 269 P.2d 1053 (1954); Hummel v. Young, 1 Utah 2d 237, 265 P.2d 410 (1953).

5. Holmes v. Judge, 31 Utah 269, 87 P. 1009 (1906); Blanchard v. Smith, 123 Utah 119, 255 P.2d 729 (1953). N.B. It is suggested that even where mistake is shown, there might be a case where the doctrine, based on principle of repose and elimination of litigious lawsuits may hurdle a mistake in the interest of settling boundaries. Each case must be viewed in the light of its own facts, equity and public policy. One might be mistaken, but shown to have ignored and consented to the boundary.

lief in equity; or that there was an absence of dispute or uncertainty in fixing a boundary[6] (which, it is said, might be eliminated as a factor by an implied agreement based on passage of time).[7]

Fronk did not meet any burden of showing any of the above factors or of showing nonoccupancy of Lot 3 by anyone (assuming that might be of importance in this case). The mere inability of plaintiffs to produce a witness in the chain of title could not relieve defendant of the burden, or defeat the fact that the fence persisted during an unproved but asserted hiatus in occupancy, where he who had title during that period deliberately encumbered the property and, at least inferentially, occupied it. The visible boundary of ancient vintage and persistency of placement are the important aspects of the doctrine, although they may be indecisive in some rather rare circumstances, mentioned above, which could destroy the vertebrae of the doctrine's backbone, looking to elimination of litigation involving, perhaps, unreliability of memory and cobwebbed evidence, and the law's policy of looking toward repose of title at one time or another.

The phrase and principle of "boundary by acquiescence" has been the subject of some obfuscation, tenuous reasoning, and rhetorical gratuities that have led to a degree of frustration among members of the bar, who, under existing precedents hardly can be expected to advise clients with full assurance of the precise outcome of a given case. There has been talk about presumption of agreement by passage of time coupled with persistence of visible monuments apparently meant to establish a boundary; occupation up to such boundary without protest over a long period of time; acquiescence for as yet no decreed specific length of time by adjoining landowners; estoppel; presence or absence of dispute and/or uncertainty as to boundary; mistake in locating the boundary; failure to ascertain that which easily could be ascertained; monuments visibly placed but not intended to mark a boundary and the like.

To date the fabric of our decisions has produced a Joseph's Coat of many colors, if such an analogy may be indulged. But it has been the product of at least the warp and woof of one consistent thread: That, rhetoric aside, this court has mended it periodically with an unbroken, but well-worn needle. And it seems to be wearable. Depending on point of view and approach, an academician may or may not consider our conclusion here as but another patch on the garment. But, what we assert is that the doctrine of "boundary by acquiescence" looks to the settling of titles under circumstances where claimants, ex post facto, having slept on their claimed rights for a long

6. Willie v. Local Realty Co., 110 Utah 523, 175 P.2d 718 (1946).

7. Brown v. Milliner, supra.

time, presently assert those rights for one reason or another, including appreciation of values, un-neighborly relations, or because of an equity measured by the length of the Chancellor's foot, while insisting on ownership of property that an ancient boundary does not reflect or designate on the surface of the property.

It is significant that in most cases, a physical, visible means of marking the boundary was effected at a time when it was cheaper to risk the mistake of a few feet rather than to argue about it, go to court, or indulge the luxury of a survey, pursuance of any of which motives may have proved more costly than the possible but most expedient sacrifice of a small land area.[8] The rub comes when, after many years, land value appreciation tempts a test of the vulnerability of a claimed ancient boundary. The struggle usually involves economics. Nothing is wrong in the urge to acquire or retain. But neither is there anything wrong in the law's espousal of a doctrine that says that with the passage of a long time, accompanied by an ancient visible line marked by monuments with other pertinent and particular facts, and with a do-nothing history on the part of the parties concerned, can result in putting to rest titles to property and prevent protracted and often belligerent litigation usually attended by dusty memory,

departure of witnesses, unavailability of trustworthy testimony, irritation with neighbors and the like. This idea is based on the concept that we must live together in a spirit justifying repose or fixation of titles where there has been a disposition on the part of neighbors to leave an ancient boundary as is without taking some affirmative action to assert rights inconsistent with evidence of a visible, long-standing boundary. In the vernacular, the doctrine might be paraphrased to enunciate that boundaries might be established by an "I don't give a hoot" attitude on the part of neighbors.

The following is dictum: A question arose here as to the length of time a line persistently marked must elapse to repose title in property claimed by another. In practically all of the cases a period of more than 20 years has been the yardstick. In one case, dictum-wise, Mr. Justice Wolfe suggested that the adverse possession statute [9] calling for 7 years conditional enjoyment should be the hallmark for boundary by acquiescence cases.[10] This period is unrealistic. It fails to recognize that under the adverse possession statute,—strictly a limitations of action statute, one must have paid taxes, improved the property and the like and claimed it continuously for 7 years. To assert that a 7-year persistent fence, nothing more, could ripen into title, is to

8. Provonsha v. Pitman, 6 Utah 2d 26, 305 P.2d 486 (* 1957) ; Harding v. Allen, 10 Utah 2d 370, 353 P.2d 911 (1960).

9. Title 78–12–11 et seq. U.C.A.1953.
10. Concurring opinion, Eckberg v. ·Bates, 121 Utah 123, 239 P.2d 205 (1951).

overlook the following: 1) that it would establish *title* in the fencemaker, 2) without his having complied with the sanctions of the adverse possession statute, which does not give title but only a defense against others who claim it.

In logic and reason, therefore, or by way of analogy, we would be disinclined to ascribe to the doctrine of "boundary by acquiescence" a period similar to the adverse possession statute. It would seem to be ridiculous, since the legislature could fix, overnight, the period for limitations of action at 2, 5, 7 or 19 years. "Boundary by acquiescence," in the nature of things invokes the office of equity. This is not too unrelated to the concept that ancient documents prove themselves because of their antiquity, unless successfully rebutted. It also has kinship to the concept of settling titles by prescription after 20 years' assertion of title coupled with occupancy. All this on the basic and sound legal philosophy that at some time or another a claimant may not disturb an ancient and continuous employment of property without affirmative objection, albeit the record owner claims previously to have been the owner thereof.

■ Two decisions of this court suggest a period of less than 20 years to perfect a title by acquiescence. One authored by Mr. Justice Wade, one by the author of this opinion. In the former,[11] Mr. Justice

Wade, commenting on the adverse possession statute, did not base his decision thereon, but carefully supplemented that suggestion with the definitive opinion, that added to that period, the circumstances indicated an ancient boundary irrespective of that statute. There was no decision that such 7-year period would be decisive, but on the contrary that this was some evidence of antiquity. In the latter,[12] it cannot be gainsaid that the same conclusion maintained, that though 18 years of definitiveness was shown, at the time of acquisition "there was an old board fence between the properties that was rotting away, and whose boards were falling off," lending mute and convincing circumstantial evidence to support the trial court's conclusion that the boundary was born in antiquity, obviously for a period in excess of the prescriptive period. These cases simply stand for the principle that a boundary by acquiescence could be determined not only by direct, but supplemented by circumstantial evidence.

■ Boiled down, it seems to us that establishment of boundary by acquiescence may be predicated upon the existence of a visibly monumented line persisting for at least 20 years or upwards, shown specifically or circumstantially, in order to meet or exceed the requirements of acquiring rights by prescription. It may be pointed out that it would be novel if one might acquire prescriptive rights in 20 years with-

11. Eckberg v. Bates, supra.

12. Harding v. Allen, footnote 8, supra.

out marking a given area with monuments, while one merely erecting a fence which remained in place for 10, 12 or 15 years could acquire the same rights in a lesser period.

All this is not to say that in some case that to date has not come to us, the facts may be such that manifest inequity might invite invocation of equity and its principles in furtherance of a departure from the many cases where a period of over 20 years was extant in establishing a boundary by acquiescence. The parade of cases to date calls on equity to flex its muscles only to pull the period below 20 years in the rarest of cases involving the doctrine of boundary by acquiescence.

McDONOUGH, CALLISTER and CROCKETT, JJ., concur.

WADE, Justice (concurring).

I concur with the main opinion, making the following comment on the dictum part thereof:

The doctrine of boundary line by acquiescence is based largely on the idea of stabilizing boundary lines without litigation. However, much uncertainty and litigation is caused in the application of the doctrine to the various factual situations to which the doctrine may be applicable, thus defeating the stabilization purposes of the doctrine. I concur with the dictum part of the opinion in the hope that it will have the effect of creating stabilization and not confusion.