*This opinion is subject to revision before final*
*publication in the Pacific Reporter*

**2016 UT 8**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

Q-2 L.L.C.,
*Petitioner,*

*v.*

WAYNE L. HUGHES, SR. and
PATRICIA L. HAMPTON-HUGHES,
*Respondent.*

No. 20140131
Filed February 16, 2016

Second District, Farmington
The Honorable Glen R. Dawson
No. 080700575

On Certiorari from the Court of Appeals

Attorneys:

David J. Shaffer, Bountiful, for petitioner

John M. Webster, Riverdale, for respondents

Kenji Kawa, Riverdale, for respondent Wayne L. Hampton

Anthony W. Schofield, Peter C. Schofield, Justin W. Star,
Salt Lake City, amicus curiae, for Attorney's Title Guaranty Fund,
First American Title Company, Old Republic National Title
Company, Stewart Title Guaranty Company, and
Westcor Land Title Company

CHIEF JUSTICE DURRANT authored the opinion of the Court, in which
ASSOCIATE CHIEF JUSTICE LEE, JUSTICE DURHAM,
and JUSTICE HIMONAS joined.

JUSTICE JOHN A. PEARCE became a member of the Court on
December 17, 2015, after oral argument in this matter, and
accordingly did not participate.

CHIEF JUSTICE DURRANT, opinion of the Court:

## Introduction

¶1    We are asked to decide only one issue in this case: how and when does a party acquire title to property under the doctrine of boundary by acquiescence? Does title transfer by operation of law at the time the elements of boundary by acquiescence are met or by judicial decree at the time the trial court enters its order? This case arises out of a boundary dispute involving Wayne Hughes and Patricia Hampton-Hughes (collectively, Hugheses) and their neighbor, Q-2, L.L.C. and its predecessors-in-interest (collectively, Q-2). Although the Hugheses agree that Q-2 properly obtained title to the property at issue under the doctrine of boundary by acquiescence, they argue that it did so at the time the elements of the doctrine were satisfied, allowing the Hugheses to subsequently reacquire the property through adverse possession. Q-2 disputes the Hugheses' claim and argues that it did not obtain title until the trial court ruled in its favor, preventing the Hugheses' adverse possession claim. After reviewing our prior boundary by acquiescence cases, the related doctrine of adverse possession, and the policy rationales underpinning these doctrines, we hold that a party obtains title under the doctrine of boundary by acquiescence by operation of law at the time the elements of the doctrine are satisfied. Accordingly, we affirm the decision of the court of appeals.

## Background

¶2    This case is based on a boundary dispute between owners of neighboring properties in Syracuse, Utah. The parties, or their predecessors-in-interest, had used an old fence line running north to south as the boundary between the parcels from 1927 to 1971. The fence had been erected on the eastern parcel of property, effectively depriving the owners of the eastern parcel of a portion of their record property. The Hugheses acquired the eastern parcel in 1998. By the time the Hugheses acquired the property, the old fence had deteriorated to the point it was no longer visible. The Hugheses proceeded to use the purchased property up to the record boundary line, which included the property west of the old fence line. This meant that the Hugheses were occupying property that the parties or their predecessors-in-interest had considered part of the western parcels for decades.

¶3    In 2001, one of the Hugheses' neighbors, Dahl Investment Company (Dahl), brought a quiet title action, claiming that Dahl had acquired the disputed property—property lying west of the old fence line up to the record boundary—under the doctrine of

boundary by acquiescence. The trial court ruled in favor of Dahl, and the Hugheses appealed. The court of appeals upheld the trial court's order in 2004, rejecting the Hugheses' arguments that the deterioration of the fence and their nonacquiescence to the fence line defeated Dahl's claim.[1]

¶4    After the Dahl claim had been litigated and appealed, Q-2, whose property bordered the Hugheses' along the same fence line at issue in the Dahl litigation, notified the Hugheses by letter in 2005 that Q-2 considered their continued use of the disputed property as trespassing on Q-2's property and demanded that they cease and desist their use. After the Hugheses continued to use the property, Q-2 brought an action in 2008 to quiet title to the disputed property under the theory of boundary by acquiescence. Q-2 relied on the same evidence that had been presented in the Dahl litigation to establish its claim. The Hugheses counterclaimed, asserting that even if Q-2 had acquired the property through boundary by acquiescence, the Hugheses had reacquired the property by adverse possession. The trial court dismissed the Hugheses' counterclaim by way of summary judgment[2] and then quieted title to the property in Q-2 after a bench trial. The Hugheses appealed.

¶5    The court of appeals affirmed the trial court's conclusion that Q-2 had obtained title to the disputed property through boundary by acquiescence but reversed the trial court's dismissal of the Hugheses' counterclaim after clarifying the applicable law.[3] The court of appeals determined that in order "to evaluate the Hugheses' adverse possession claim[, the court] must first determine when legal

---

[1] *Dahl Inv. Co. v. Hughes*, 2004 UT App 391, ¶¶ 10–11, 101 P.3d 830.

[2] It is unclear on what grounds the trial court granted Q-2's summary judgment motion. Q-2 asked for summary judgment on two grounds: first, Q-2 argued the Hugheses could not prove adverse or hostile possession of the property because they believed they owned the disputed land; and second, they stated that the Hugheses did not possess the property for a sufficient amount of time because Q-2 did not own the property until after the lawsuit, the claim at issue in this decision. These appear to be arguments not over facts, but whether on the undisputed facts the Hugheses were entitled to judgment as a matter of law.

[3] *Q-2, LLC v. Hughes*, 2014 UT App 19, ¶¶ 13, 16, 319 P.3d 732.

title to the disputed property passed to Q-2 or its predecessor-in interest."[4] Although the court of appeals noted that the issue "appear[ed] to be an issue of first impression for Utah Courts," it found "clear guidance in our . . . boundary by acquiescence jurisprudence,"[5] and held that "legal title to the disputed property passed to Q-2's predecessor-in-interest no later than 1971" by operation of law.[6] Thus, "the Hugheses' predecessor-in-interest could convey only 'bare record title' to the disputed property to the Hugheses by the 1998 warranty deed, and legal title rested with Q-2."[7]

¶6 After ruling on this issue, the court of appeals also clarified that the adverse or hostile element of adverse possession can be satisfied when "a person in possession of the property . . . possesses a written document purporting to convey title."[8] "Thus, the Hugheses' possession of the entire property described by their warranty deed"—a deed that conveyed only "bare record title"— "was adverse to the legal title of the disputed property," which had vested in Q-2 decades ago.[9] Having clarified the law that the trial court should apply, the court of appeals also held that "[o]n each element of their claim of adverse possession, the Hugheses introduced sufficient evidence to survive summary judgment" and remanded the case for further proceedings.[10] Two of the three judges concurred separately, noting the potential problems that arise from allowing title to transfer by operation of law without judicial intervention and asking us to review the decision.[11] Q-2 petitioned for review, and its petition was accompanied by an amicus brief filed

---

[4] *Id.* ¶ 7.

[5] *Id.* ¶ 8.

[6] *Id.* ¶ 13.

[7] *Id.* ¶ 16.

[8] *Id.* ¶15 (alteration in original) (quoting UTAH CODE § 78B-2-210(1)(a)).

[9] *Id.* ¶¶ 13, 16.

[10] *Id.* ¶¶ 17–18. Our grant of certiorari did not encompass the issue of whether the court of appeals correctly reversed the trial court's grant of summary judgment in favor of Q-2 on the Hugheses' adverse possession claim.

[11] *See id.* ¶¶ 19–20 (Orme, J., concurring).

by a coalition of title companies (collectively, Title Companies) urging us to grant Q-2's petition, which we did.

## Standard of Review

¶7    We granted certiorari in this case to review whether the court of appeals correctly held that property transfers by operation of law at the time the elements of boundary by acquisition are satisfied.[12] The determination of when title transfers under this doctrine requires an "interpretation[] of common law principles," which we review for correctness.[13] We have jurisdiction pursuant to Utah Code section 78A-3-102(3)(a).

## Analysis

¶8    The parties ask us to decide at what point in time a party obtains title under boundary by acquiescence. While we have not yet expressly resolved this issue, we have necessarily determined in our prior boundary by acquiescence cases that title transfers by operation of law at the time the elements are met and prior to judicial adjudication. This corresponds precisely with the way title is transferred under the related doctrine of adverse possession. Although Q-2 and the amici have invited us to deviate from this precedent on policy grounds, the policy goals they put forth likely cannot be achieved by our ruling in this case and, regardless, are outweighed by competing policy goals.

¶9    We discuss these issues in turn, beginning first with our prior caselaw related to the transfer of title in boundary by acquiescence cases, finding that in those cases we necessarily determined that title transferred by operation of law without judicial involvement. We then confirm our boundary by acquiescence jurisprudence on this issue by looking to the treatment of title transfer under the closely related doctrine of adverse possession. Finally, we address the policy considerations suggested by the parties.

---

[12] *See John Holmes Constr., Inc. v. R.A. McKell Excavating, Inc.*, 2005 UT 83, ¶ 6, 131 P.3d 199 ("On certiorari, we review the decision of the court of appeals, not the trial court.").

[13] *Associated Gen. Contractors v. Bd. of Oil, Gas & Mining*, 2001 UT 112, ¶ 18, 38 P.3d 291.

## I. The Weight of Legal Authority Instructs that Title Is Granted by Operation of Law

*A. In Our Prior Boundary by Acquiescence Cases, We Have Held that Parties Obtain Title by Operation of Law and Not by Judicial Decree*

¶10 Although our precedent on this issue is limited, it is unmistakable: title is obtained by operation of law at the time the elements of boundary by acquiescence are satisfied. The doctrine of boundary by acquiescence has been recognized in Utah since at least 1887.[14] The elements are well established,[15] and the parties do not dispute that Q-2 successfully proved its claim to the property under the doctrine before the trial court. The only issue is when, exactly, Q-2 should be deemed to have acquired title to the disputed property. We have previously determined that title under the doctrine of boundary by acquiescence transfers by operation of law, not by judicial order. Although our prior cases could have been more explicit in addressing this issue, the decisions' import is clear, and we take this opportunity to reaffirm our precedent.

¶11 In two cases, *Brown v. Peterson Development Co.*,[16] and *RHN Corp. v. Veibell*,[17] we necessarily determined that title is conferred by operation of law at the time the elements of boundary by acquiescence are satisfied.[18] The court of appeals correctly noted that

---

[14] *See Suitzgable v. Worseldine*, 15 P. 144, 144–45 (Utah 1887) ("[T]hey invoke the principle that boundary lines long acquiesced in conclusively establish that they are the true boundaries, and estop adjoining proprietors from disputing them. We recognize the principle . . . .").

[15] "[E]stablishment of boundary by acquiescence requires (i) occupation up to a visible line marked by monuments, fences, or buildings, (ii) mutual acquiescence in the line as a boundary, (iii) for a period of at least 20 years, (iv) by adjoining landowners." *Jacobs v. Hafen*, 917 P.2d 1078, 1081 (Utah 1996).

[16] 622 P.2d 1175 (Utah 1980).

[17] 2004 UT 60, 96 P.3d 935.

[18] A third, earlier case also touched on this issue in express dicta. *See King v. Fronk*, 378 P.2d 893, 896–97 (Utah 1963). After deciding the boundary issue before the court, Chief Justice Henriod added a discussion focused on what the required time should be to satisfy the "long period of time" element. *Id.* In so doing, he implicitly assumed that the passage of that time—regardless of the length that would be

(Continued)

"a recognition that title had transferred by operation of law at the time the elements of the doctrine were met—and before a judicial ruling or order was entered—was essential to [our] disposition of the questions presented."[19] For a decision to become precedent and trigger stare decisis, "it must be (1) [a] deliberate or solemn decision of a court or judge [2] made after argument of a question of law fairly arising in a case, and [3] necessary to its determination."[20] As discussed below, in both *Brown* and *Viebell*, the issue of whether and when a party obtained title was a central issue argued by the parties and necessary to our determination of the cases. Those decisions are accordingly binding precedent, and Q-2 has not requested that we overturn them.[21]

¶12 First, in *Brown v. Peterson Development Co.*, a determination of whether a party's predecessor-in-interest had obtained title by boundary by acquiescence prior to litigation was both central and necessary to our ultimate holding. In a dispute between a developer and its neighbors, the developer claimed ownership of all property up to an old fence line by virtue of a quitclaim deed executed by its predecessor-in-interest, Reynold Johnson.[22] We found that the undisputed evidence showed that all parties (and their predecessors-in-interest) had acquiesced in the fence boundary for more than forty years.[23] Accordingly, we held that the defendants' "legal title to any part of the disputed strip of land *had been extinguished* when [Mr.] Johnson's *occupancy and possession had ripened into a legal title*."[24] This "ripening" of title left the defendants with "only the bare record

---

required—would be sufficient on its own to grant title, stating that a "persistent fence, *nothing more*, [can] *ripen into title*." *Id.* at 896 (emphasis added).

[19] *Q-2, LLC v. Hughes*, 2014 UT App 19, ¶ 12, 319 P.3d 732.

[20] *Essential Botanical Farms, LC v. Kay*, 2011 UT 71, ¶ 19 n.17, 270 P.3d 430 (alterations in original) (internal quotation marks omitted).

[21] Even if Q-2 had, we would not because to do so would create an unnecessary and baseless distinction between the doctrines of boundary by acquiescence and adverse possession, *infra* Part I.B, and the policy arguments put forth by Q-2 and the amici for reconsidering our precedent are not persuasive, *infra* Part II.

[22] *Brown*, 622 P.2d at 1176–77.

[23] *Id.* at 1177.

[24] *Id.* (emphasis added).

title" to the property.[25] We ordered title to be quieted in the developer because its predecessor-in-interest, Mr. Johnson, "had acquired title to the disputed strip of land by operation of law under the doctrine of boundary by acquiescence" and had transferred that title to the developer by quitclaim deed—years before any lawsuit was filed.[26] Thus, we held in *Brown* that a party could acquire title to disputed property by operation of law and transfer that title—all prior to and without judicial involvement.

¶13 The second case, *RHN Corp. v. Veibell*, also required us to decide whether a party had obtained title by operation of law prior to litigation. There, the parties had "acquiesced in the fence as a boundary beginning in 1938 and continuing at least up until either 1979 or 1981," when the plaintiff, Mr. Veibell, "discovered the true location of the record boundary."[27] The defendant argued that this discovery resulted in Mr. Viebell's subsequent acquiescence to the record boundary, defeating his claim.[28] We rejected this argument. Although we noted that Mr. Viebell "may not have acquiesced in a fence as a boundary after the time he discovered that the record boundary line did not correspond with the fence line," we found that "[Mr.] Veibell and his predecessors-in-interest acquiesced in the fence for a long period of time *prior* to his discovery of the true record boundary."[29] We ultimately held that Mr. Viebell's "occupancy and possession for a long period of time 'ripened into a legal title' long before he discovered the actual location of the record boundary" and, consequently, long before the quiet title action was filed.[30] Again in this case, as in *Brown*, we held that a party's possession had ripened into title years before a lawsuit was ever filed. And, as in *Brown*, this holding was necessary to our ultimate resolution of the case.

¶14 A fair reading of these cases reveals that we held that the parties obtained title by operation of law at the time the elements of boundary by acquiescence were satisfied, without need for any

---

[25] *Id.*

[26] *Id.* at 1177–78.

[27] *Veibell*, 2004 UT 60, ¶ 30.

[28] *Id.* ¶ 31.

[29] *Id.* (discussing and applying *Staker v. Ainsworth*, 785 P.2d 417, 420 (Utah 1990)).

[30] *Id.* ¶ 30 (quoting *Brown*, 622 P.2d at 1177–78).

judicial involvement. In both cases, we necessarily determined that a party had obtained title years prior to any litigation. The precedent found in *Brown* and *Veibell* controls the issue before us, and we take the opportunity today to reaffirm our prior decisions by explicitly stating that the doctrine of boundary by acquiescence grants title by operation of law when its elements are met. The doctrine simultaneously extinguishes the previous owners' legal title and leaves them with only "bare record title." To be sure, there will be cases in which judicial adjudication becomes necessary to resolving disputes, but a judicial adjudication of a boundary dispute does not itself confer title. Rather, it merely determines the prior point at which title vested.[31]

*B. The Way in Which Courts Treat the Transfer of Title in Adverse Possession Cases Supports the Conclusion that Title in Boundary by Acquiescence Cases Is Transferred by Operation of Law*

¶15 Our decision to follow and affirm our precedent in *Brown* and *Veibell* on the transfer of title under the doctrine of boundary by acquiescence is supported by our and other courts' treatment of "its sister doctrine of adverse possession."[32] Adverse possession, like

---

[31] This reasoning defeats Q-2's secondary argument that the standard of proof we have set for boundary by acquiescence cases—clear and convincing—suggests that judicial review is essential to a boundary by acquiescence claim. It is the existence of the facts supporting the elements of the doctrine, and not their clear and convincing exhibition before a court, that establishes title. *See Colquhoun v. Webber*, 684 A.2d 405, 410 (Me. 1996); *Mahoney v. Tara, LLC*, 107 A.3d 887, 891 (Vt. 2014) ("In other words, although an adverse party bears the burden of proving the elements of [the doctrine], . . . her action, if successful, does not *confer* title but rather *recognizes* title vested independently of the judgment."). A high burden of proof has not prevented other courts from determining that title transferred by operation of law under the related doctrine of adverse possession. *See, e.g., Celebration Worship Ctr., Inc. v. Tucker*, 35 N.E.3d 251, 254–55 (Ind. 2015) (holding that a homeowner "establish[ed] by clear and convincing proof that the homeowner's immediate predecessor in title adversely possessed and obtained fee simple title to the disputed real estate by operation of law").

[32] *Brown v. Brodell*, 756 N.W.2d 779, 782 (N.D. 2008); *accord Essential Botanical Farms*, 2011 UT 71, ¶ 22 (describing boundary by acquiescence as a legal doctrine "that may deprive a person of fee simple ownership in real property" and stating that boundary by

(Continued)

boundary by acquiescence, is a common law doctrine originating in England.[33] Indeed, the doctrine of boundary by acquiescence "developed from the cause of action for adverse possession."[34] There are generally two forms of adverse possession: long-term and short-term.[35] Long-term adverse possession, the most common form of the doctrine, allows a party to obtain title to property after being in "(1) actual, (2) open and notorious, (3) hostile, (4) exclusive, and (5) continuous possession of the land for the statutory period, usually about twenty years."[36] An apparent minority of states have a short-term adverse possession doctrine, either in addition to the long-term form or in place of it.[37] Short-term adverse possession has the same general elements as the long-term form with two major differences: an additional requirement—payment of property taxes or a claim based on color of title—and a shortened possession period—usually five to seven years instead of twenty.[38]

¶16 Despite the widespread acceptance of the two forms of adverse possession throughout the United States, and its application in literally thousands, if not tens of thousands, of different factual scenarios, we have not found, and counsel could not point us to, any case from any jurisdiction requiring judicial adjudication to confer title by adverse possession. Instead, there is overwhelming support for the contrary principle: title is conferred by operation of law and

---

acquiescence, prescriptive easements, and adverse possession are "related real property doctrines").

[33] James H. Backman, *The Law of Practical Location of Boundaries and the Need for an Adverse Possession Remedy*, 1986 B.Y.U. L. REV. 957, 958 (1986).

[34] 42 CAUSES OF ACTION 2D 489, § 12 (2009). Some states even blend the two doctrines together in certain situations. *See, e.g.*, *Buckner v. Hosch*, 987 So. 2d 1149, 1152 (Ala. Civ. App. 2007) (discussing "the hybrid form of adverse possession applicable in boundary-line disputes").

[35] Backman, *supra* note 33, at 959.

[36] *Id.* at 959 & n.15 ("Forty-one states have this type of adverse possession.").

[37] *Id.* at 960–61, 961 nn.27–28.

[38] *Id.* at 960–61.

"[n]o judicial action is necessary."[39] Indeed, our own adverse possession jurisprudence has long accepted this rule.[40]

¶17 "Utah has no long-term adverse possession statute,"[41] leaving us with only the short-term form of adverse possession. We

---

[39] *Murdock v. Zier*, 137 P.3d 147, 152 (Wyo. 2006); *see, e.g.*, *Gorte v. Dep't of Transp.*, 507 N.W.2d 797, 801 (Mich. Ct. App. 1993) ("Thus, assuming all other elements have been established, one gains title by adverse possession when the period of limitation expires, not when an action regarding the title to the property is brought."); *Williams v. Frymire*, 186 S.W.3d 912, 922 (Mo. Ct. App. 2006) ("Adverse possession for the statutory period establishes an indefeasible legal title in the possessor, the title of the record owner is divested, and that title is not lost by abandonment, or failure to assert it after it has been perfected." (internal quotation marks omitted)); *Gorman v. City of Woodinville*, 249 P.3d 1040, 1042–43 (Wash. Ct. App. 2011) ("Once an adverse possessor has fulfilled the conditions of the doctrine, title to the property vests in his favor. The adverse possessor need not record or sue to preserve his rights in the land." (footnote omitted)); 3 AM. JUR. 2D *Adverse Possession* § 235 ("An adverse possession of land for the period of limitation operates of itself as a grant of all adverse title and interests to the occupants. No judicial action is necessary to effectuate transfer." (footnote omitted)).

[40] In an early adverse possession case not cited by the parties, we necessarily held that title passed by operation of law prior to a judicial adjudication—just as with the boundary by acquiescence cases discussed above. *See Rydalch v. Anderson*, 107 P. 25, 28–29 (Utah 1910) ("[W]hen the [adverse possession] statute in force prior to 1888 had fully run, the right to the property held by adverse possession became a vested right, which could not be affected by a subsequent change of the law."). Other adverse possession cases confirm this holding. *See, e.g.*, *Elder v. Nephi City ex rel. Brough*, 2007 UT 46, ¶ 19, 164 P.3d 1238 (stating that a party may "obtain[] an interest in land by operation of law through prescription or adverse possession," though we declined in that case to allow a third party to establish the extent of the interest potentially acquired); *Toltec Ranch Co. v. Babcock*, 66 P. 876, 878 (Utah 1901) ("[W]here such property is held and possessed adversely to the legal title for [seven years], the party so holding and possessing acquires the title to the property by adverse possession.").

[41] *Jacobs*, 917 P.2d at 1080.

recognize, however, that "short-term adverse possession [often] does not help resolve boundary disputes," because "[o]ne who possesses land for a long period without having legal title, but believing he is the actual owner, is unlikely to think of procuring a tax description in order to pay taxes on the land" because "he will think that he is already paying taxes on it."[42] "Utah property owners must [usually] look to other methods of resolving such disputes," including boundary by acquiescence.[43] Boundary by acquiescence thus "fills an important gap in [Utah] law"[44] that exists "[b]ecause Utah has no long-term adverse possession statute."[45] Our boundary by acquiescence doctrine "serves as a primary legal mechanism for settling boundary disputes" in Utah[46]—disputes that would be "typical [long-term] adverse possession case[s]" in other states.[47]

---

[42] Backman, *supra* note 33, at 961–62.

[43] *Id.* at 962. Boundary by acquiescence exists as one of three major doctrines employed in Utah to resolve boundary disputes, alongside boundary by estoppel and boundary by agreement. *See Staker v. Ainsworth*, 785 P.2d 417, 423 n.4 (Utah 1990).

[44] *Staker*, 785 P.2d at 423.

[45] *Jacobs*, 917 P.2d at 1080.

[46] *Id.*

[47] Backman, *supra* note 33, at 969–70. An example of how other states apply the doctrine of adverse possession to boundary disputes is found in the recent Wyoming Supreme Court case of *Graybill v. Lampman*. 332 P.3d 511 (Wyo. 2014). The facts and claims of the case are remarkably similar to those before us today: two parties ended up in a dispute when it was discovered an old fence did not follow the record boundary. *Id.* at 515–16. When a new party, the Lampmans, obtained the parcel upon which the fence was erected, they proceeded to use the property beyond the fence line up to the record boundary. *Id.* at 517–18. The Lampmans' neighbors, the Prados, claimed that the parties and their predecessors-in-interest had accepted the fence as a boundary for over twenty years and that the Prados had gained title to the property lying between the fence and the record boundary under the doctrine of adverse possession. *Id.* at 519. The Lampmans responded that, even if the Prados had acquired title, they had re-aquired title through their own subsequent adverse possession of the property, beginning when they purchased the land. *Id.* The Wyoming Supreme Court agreed that the Prados had acquired possession after twenty years had expired,

(Continued)

¶18 The historical connection between adverse possession and boundary by acquiescence, coupled with the similarities between the two doctrines' application in nearly identical factual scenarios, compels a similar method of transferring title. The doctrines work in much the same manner,[48] "rest[] upon the same reason[s],"[49] and serve the same purpose—"putting to rest titles to property and prevent[ing] protracted and often belligerent litigation."[50] Indeed, we have noted the similarities between the doctrines in prior cases and have worked to "promote consistency and predictability among these related real property doctrines."[51] We therefore see no principled way of distinguishing between the doctrines on the issue of title transfer. Thus, acquisition of title under the doctrine of

_____

noting that no judicial action was necessary to establish title. *Id.* at 522 & n.15. The court then remanded for the trial court to determine "whether the Lampmans adversely possessed the disputed parcel back from the Prados." *Id.* at 522. Our holding today similarly allows for the possibility that "[o]nce real property is vested by adverse possession [or boundary by acquiescence], title can [then] be divested by conveyance, descent[,] or operation of law" as a result of another's prescriptive use. *Id.*

[48] Both doctrines grant title to property based on a party's long-term possession of the property. *See Hammond v. Johnson*, 66 P.2d 894, 900 (Utah 1937), *superseded on other grounds by statute*, UTAH CODE § 73-3-1 ("One may obtain . . . title by disseisin of the owner and use and possession of the [property] for the statutory time, commonly called 'adverse possession.'").

[49] *Holmes v. Judge*, 87 P. 1009, 1012 (Utah 1906) ("The [doctrine of boundary by acquiescence] seems to have been adopted as a rule of repose, with a view to the quieting of titles, and rests upon the same reason as our statute prohibiting the disturbance of an adverse possession which has continued for 20 years.").

[50] *King*, 378 P.2d at 896.

[51] *Essential Botanical Farms*, 2011 UT 71, ¶ 22 (adopting the clear and convincing standard of proof in boundary by acquiescence cases in order to conform with the standard used in prescriptive easements and at least some adverse possession cases); *see also Hobson v. Panguitch Lake Corp.*, 530 P.2d 792, 795 (Utah 1975) (defining the "long period of time" element of boundary by acquiescence as requiring twenty years, in order to "relate[] to the common law prescriptive period").

boundary by acquiescence operates in the same manner as it does under the doctrine of adverse possession—by operation of law, not by judicial fiat.[52] And because title is vested as soon as the elements are satisfied just as if title had been transferred by deed, "title remains vested until it passes by grant, descent, adverse possession, or some other operation of law."[53] A different result would both contravene our clear precedent and create an unnecessary and unjustified distinction between the two closely related doctrines of boundary by acquiescence and adverse possession.

## II. The Policies Underlying the Doctrine of Boundary by Acquiescence and Other Related Doctrines Favor the Transfer of Title by Operation of Law

¶19  Both our boundary by acquiescence jurisprudence and our and other state courts' uniform treatment of the related doctrine of adverse possession support a determination that title is conferred by operation of law under the boundary by acquiescence doctrine. Q-2 and the amici nevertheless argue that, as a matter of policy, title should transfer under the doctrine of boundary by acquiescence only at the time of a judicial determination. Their policy arguments are best summarized by Judge Orme's concurrence in the case below:

> [T]he idea that legal title to real property would be deemed to have shifted pursuant to doctrines like boundary by acquiescence or adverse possession not at a point in time when a judicial decree so determines, but at some earlier point in time when the elements of such doctrines are factually satisfied, is concerning. This will mean that some real estate titles will be other than as shown by recorded documents, other than as memorialized in judicial decrees, and other than as an inspection of the property would suggest. The resulting uncertainty seems to guarantee a level of risk

---

[52] *See* Thomson Reuters/West, *Boundaries: Adverse Possession Defeats Border by Acquiescence*, 43-Mar REAL EST. L. REP. 7, 7 (2014) ("Adverse possession and boundary by acquiescence are two common doctrines under which the lines between properties can change without any judicial determination, written document[,] or recorded instrument.").

[53] *Goldman v. Quadrato*, 114 A.2d 687, 690 (Conn. 1955).

that is anathema to prospective real estate buyers as well as title insurers.[54]

These concerns are valid. While adverse possession and boundary by acquiescence "resolve many disputes, the fact that they are 'off record' also causes a host of problems."[55] Although we recognize the impact prescriptive claims to property may have on a title record system, we are cautious when we are asked to depart from well-grounded precedent. For the reasons set forth below, we are not persuaded that a deviation from the overwhelming weight of authority would prove a better approach than the one long in place.

¶20 Under Q-2's proposal, a party would not obtain title under the doctrine of boundary by acquiescence until the moment a judicial decree is entered. We see at least two problems with this approach. First, boundary by acquiescence exists to "avoid[] litigation and promot[e] stability in land ownership"[56] by allowing parties to "apply [the doctrine] to resolve matters outside of court."[57] Q-2's proposal essentially adds a fifth element to the doctrine: judicial adjudication. Under Q-2's suggested approach, a party could not obtain title under the doctrine of boundary by acquiescence without involving the courts. Such a rule would discourage out-of-court settlement of boundary disputes, and would, in fact, create an incentive to litigate that is antithetical to the purpose for which the doctrine exists: a "realization, ancient in our law, that peace and good order of society is [sic] best served by leaving at rest possible disputes over long established boundaries."[58] To be sure, the goal of

---

[54] *Q-2, LLC v. Hughes*, 2014 UT App 19, ¶ 19, 319 P.3d 732 (Orme, J., concurring) (footnote omitted).

[55] Thomson Reuters/West, *Boundaries: Adverse Possession Defeats Border by Acquiescence*, 43-MAR REAL EST. L. REP. 7, 7 (2014); *accord Hobson v. Panguitch Lake Corp.*, 530 P.2d 792, 794 (Utah 1975) ("[I]t must be appreciated that recognition of such boundaries does have the effect of transferring ownership of disputed strips of property without compliance with the statute of frauds; and it may be at variance with recorded conveyances." (footnote omitted)).

[56] *Staker v. Ainsworth*, 785 P.2d 417, 423 (Utah 1990).

[57] Elliot R. Lawrence, *Settling Boundary Disputes Using Utah's Boundary by Acquiescence Doctrine*, 27-Dec UTAH B. J. 46, 50 (2014).

[58] *Staker*, 785 P.2d at 423 (alteration in original) (internal quotation marks omitted).

promoting out-of-court resolution of boundary disputes cannot always be realized, especially in a case like the one before us today. But the fact that some cases require judicial involvement does not mean that we should impose the requirement of a judicial decree and thereby increase judicial involvement in boundary disputes.[59]

¶21 The other obvious problem we see with Q-2's approach is that requiring a judicial order to transfer title protects only the first party to claim the property, no matter how long that party has "slept on [its] rights."[60] Under this approach, because a judicial decree confirming a boundary would be entered regardless of intervening events or the passing of years—as happened between the Hugheses and Dahl—a party could prescriptively claim property decades after its claim to the property arose.[61] It seems unfair to honor only the first party's prescriptive claim to title—refusing to recognize another party's subsequent, lengthy, productive, and uninterrupted use of the land[62]—simply because that party got there first. We have long

---

[59] The Title Companies also suggest that allowing title to transfer by operation of law, as opposed to transfer after judicial adjudication, "creates the likelihood of lawsuits for rescission based on mutual mistake, claims for negligent misrepresentation, actions for breach of warranty[,] and so forth." First, as discussed below, it is not the timing of title transfer that creates the likelihood of these types of lawsuits, but the fact that prescriptive claims to title exist. Second, it seems inherently contradictory to argue that encouraging litigation in order to protect a property interest helps reduce litigation.

[60] *Glenn v. Player*, 326 P.2d 717, 719 (Utah 1958).

[61] *See Dahl Inv. Co. v. Hughes*, 2004 UT App 391, ¶¶ 11–13, 101 P.3d 830 (rejecting the Hugheses' statute of limitations argument and holding that, although the fence had deteriorated completely by 1965, "Dahl Investment's failure to maintain a visible marker of the boundary after 1965 does not defeat the claim," and that Dahl was not required "to show continuing compliance with the boundary by acquiescence requirements," even though the case was brought almost four decades after the boundary had been established); *see also Cottrell v. Pickering*, 88 P. 696, 700–01 (Utah 1907) (suggesting that the doctrine of laches does not apply in boundary by acquiescence cases because "[i]f there are any laches, they are to be imputed as much to one [party] as to the other").

[62] *See* 142 AM. JUR. PROOF OF FACTS 3D 349 § 2 (2014) ("One often-repeated justification is that adverse possession bars stale claims by

(Continued)

recognized that "equity aids the vigilant," and "a court of equity is reluctant to reward a party who has been dilatory in seeking his remedy."[63] Holding that title is conferred by operation of law encourages parties to assert their rights—although one party may obtain property through boundary by acquiescence, if it then sleeps on its rights by allowing the boundary monument to deteriorate and the record title holder to occupy and use the property, the holder of "bare record title" may be able to reclaim legal title to the property.[64]

¶22 It has long been the case under Utah law that there will be many interests in land that may not be reflected in the records. Indeed, the potential for off-record interests has been deliberately built into our system of property law through decades of acceptance and reliance on doctrines such as boundary by acquiescence, boundary by agreement, boundary by estoppel, adverse possession, and prescriptive easements. It is the existence and use of these doctrines that leave the record incomplete—not the timing of transfer of title. And our acceptance of these doctrines is not a rejection of the benefits of our record title system, but a recognition that, at least in certain circumstances, there are other values that can outweigh those benefits. Without a complete overhaul of our entire

---

legal owners of land as against strangers who have taken possession of the owners' properties. Another justification suggests that such bars punish true owners who, through their own fault or neglect, failed to assert their rights against adverse claimants. . . . Courts have also noted that adverse possession may promote efficient land development by seeking to reward those who will make productive use of land. Adverse possession may also serve to protect the reliance interests of either the adverse possessor or others dealing with the adverse possessor that are justifiably based on the status quo." (footnotes omitted)).

[63] *Jacobson v. Jacobson*, 557 P.2d 156, 158–59 (Utah 1976).

[64] This case appears to be a perfect example: although Q-2 was apparently aware of the Dahl litigation and sent a letter claiming the Hugheses were trespassing on its property—a statement at odds with its assertion in court that it did not own the property until the later judicial order—it never rebuilt the dilapidated fence and waited several years before filing a quiet title action. Q-2 has provided us with no reason to distinguish between its prescriptive ownership of the property and the Hugheses', and our principles of equity suggest we not reward Q-2 for sleeping on its rights.

system of common law property doctrines, something neither party has suggested, modifying just one of these doctrines—boundary by acquiescence—in the way proposed by Q-2 does little to address the issue of incomplete land records. Such a change would only disrupt legitimate expectations and undermine vested property rights. The benefits of a completely accurate title record system—however desirable when viewed in isolation—are an insufficiently compelling reason to upset the reliance interests of property holders across the entire state in this manner.

¶23 As we have stated, we are cautious when asked to depart from well-grounded precedent. This is especially true when the policy arguments provided for the departure are against the full weight of legal authority. Here, there are strong, countervailing policies supporting our current system of property law, a system that property owners throughout Utah rely upon. Accordingly, the policy arguments put forth by Q-2 and the Title Companies do not persuade us to depart from our precedent on the doctrine and its policy. Although we recognize that litigation may sometimes be necessary, our holding today allows parties the opportunity to acquire property through the doctrine of boundary by acquiescence without going to court.

## Conclusion

¶24 Today, we reaffirm and make express our prior holdings on the timing of title transfer under the doctrine of boundary by acquiescence. Our prior cases necessarily held that the doctrine confers and settles title by operation of law, not by judicial decree. Transfer by operation of law correlates with and is confirmed by the related doctrine of adverse possession. The policy considerations put forth by Q-2 and the amici do not justify a departure from this result. We therefore hold that the boundary by acquiescence doctrine confers title by operation of law at the time the elements of the doctrine are satisfied and that a judicial adjudication of a boundary dispute does not grant title, but merely recognizes the title that has already vested. The decision of the court of appeals is affirmed.